**EXHIBIT A**

# NAGEL RICE & MAZIE, LLP

COUNSELLORS AT LAW

103 EISENHOWER PARKWAY
ROSELAND, NEW JERSEY 07068
(973) 618-0400
FAX: (973) 618-9194
www.nrmlaw.com

———

NEW YORK OFFICE
230 PARK AVENUE
SUITE 1000
NEW YORK, NEW YORK 10169
(212) 551-1465

PLEASE REPLY TO
ROSELAND OFFICE

BRUCE H. NAGEL*
JAY J. RICE*
DAVID A. MAZIE*†
ROBERT H. SOLOMON
ADAM M. SLATER*◊
ERIC D. KATZ*◊△
DAVID M. FREEMAN△
DIANE E. SAMMONS◊
———
HARRY A. MARGOLIS
1928-2002

◊MEMBER OF N.J. & N.Y. BARS
△MEMBER OF N.J. & PA. BARS

COUNSEL
HERBERT I. WALDMAN*□
WAYNE D. GREENSTONE◊
LORI I. MAYER◊
RANDEE M. MATLOFF

ANDREW L. O'CONNOR
IRINA B. ELGART◊

*CERTIFIED BY THE SUPREME COURT OF
  NEW JERSEY AS A CIVIL TRIAL ATTORNEY
†CERTIFIED AS A CIVIL TRIAL SPECIALIST
  BY THE NATIONAL BOARD OF
  TRIAL ADVOCACY
□CERTIFIED BY THE SUPREME COURT OF
  NEW JERSEY AS A CRIMINAL TRIAL ATTORNEY

March 9, 2006

VIA REGULAR MAIL
AND CERTIFIED MAIL, RRR

S.A.C. Capital Management, LLC
72 Cummings Point Road
Stamford, Connecticut

Re:  Biovail Corporation, et als. v. S.A.C. Capital
     Management, LLC, et als.
     Docket No. L-1583-06

Dear Sir/Madam:

Enclosed please find a Summons, Complaint and Jury Demand,
and Track Assignment Notice regarding the above referenced
matter.

We suggest you immediately turn these papers over to your
attorney as your answer is due within 35 days of service.

Very truly yours,

BRUCE H. NAGEL

BHN/dlr
Enclosure
BHN\Biovail\SAC Capital Managementltr.030606.encl summons & comp

NAGEL RICE & MAZIE, LLP
103 Eisenhower Parkway
Roseland, New Jersey 07068
(973) 618-0400

KASOWITZ, BENSON, TORRES & FRIEDMAN LLP
1633 Broadway
New York, New York 10019
(212) 506-1700

ATTORNEYS FOR PLAINTIFFS

| | |
|---|---|
| BIOVAIL CORPORATION and<br>BIOVAIL PHARMACEUTICALS, INC., | :SUPERIOR COURT OF NEW JERSEY<br>:LAW DIVISION:  ESSEX COUNTY<br>:DOCKET NO. L-1583-06 |
| Plaintiffs, | : |
| - against - | : |
| S.A.C. CAPITAL MANAGEMENT, LLC,<br>S.A.C. CAPITAL ADVISORS, LLC,<br>S.A.C. CAPITAL ASSOCIATES, LLC,<br>S.A.C. HEALTHCO FUNDS, LLC, SIGMA<br>CAPITAL MANAGEMENT, LLC, STEVEN A.<br>COHEN, ARTHUR COHEN, JOSEPH HEALEY,<br>TIMOTHY MCCARTHY, DAVID MARIS,<br>GRADIENT ANALYTICS, INC., CAMELBACK<br>RESEARCH ALLIANCE, INC., JAMES CARR<br>BETTIS, DONN VICKREY, PINNACLE<br>INVESTMENT ADVISORS, LLC, HELIOS<br>EQUITY FUND, LLC, HALLMARK FUNDS,<br>GERSON LEHRMAN GROUP, GERSON<br>LEHRMAN GROUP BROKERAGE SERVICES,<br>LLC, THOMAS LEHRMAN, PATRICK DUFF,<br>JAMES LYLE, and DOES 1 THROUGH 50, | :<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>Civil Action<br><br>SUMMONS |
| Defendants. | :<br>: |

From The State of New Jersey

To The Defendant(s) Named Above: S.A.C. Capital Management, LLC

The plaintiff, named above, has filed a lawsuit against you in the Superior Court of New Jersey. The complaint attached to this summons states the basis for this lawsuit. If you dispute this complaint, you or your attorney must file a written answer or motion and proof of service with the deputy clerk of the Superior Court in the county listed above within 35 days from the date you received this summons, not counting the date you received it. (The address of each deputy clerk of the Superior Court is provided.) If the complaint is one in foreclosure, then you must file your written answer or

motion and proof of service with the Clerk of the Superior Court, Hughes Justice Complex, CN 971, Trenton, New Jersey 08625. A filing fee of $135.00 for Law Division cases or $135.00 for Chancery Division cases, payable to the Clerk of the Superior Court and a completed Case Information Statement (available from the deputy clerk of the Superior Court) must accompany your answer or motion when it is filed. You must also send a copy of your answer or motion to plaintiff's attorney whose name and address appear above, or to the plaintiff, if no attorney is named above. A telephone call will not protect your rights; you must file and serve a written answer or motion (with fee and completed Case Information Statement) if you want the court to hear your defense.

     If you do not file and serve a written answer or motion within 35 days, the court may enter a judgment against you for the relief plaintiff demands, plus interest and costs of suit. If judgment is entered against you, the Sheriff may seize your money, wages or property to pay all or part of the judgment.

     If you cannot afford an attorney, you may call the Legal Services office in the county where you live. A list of these offices is provided. If you do not have an attorney and are not eligible for free legal assistance, you may obtain a referral to an attorney by calling one of the Lawyer Referral Services. A list of these numbers is also provided.

DONALD F. PHELAN
Clerk of the Superior Court

Dated: March 9, 2006

Name of Defendant to be Served:    S.A.C. Capital Management LLC
Address of Defendant to be Served:    72 Cummings Point Road, Stamford, Connecticut

## DEPUTY CLERKS OF THE SUPERIOR COURT

ATLANTIC COUNTY:
Lori Mooney, Clerk
Civil Division, Direct Filing
1201 Bacharach Blvd., First Fl.
Atlantic City, NJ 08401
*LAWYER REFERRAL*
(609) 345-3444
*LEGAL SERVICES*
(609) 348-4200

BERGEN COUNTY:
Kathleen A. Donovan, Clerk
119 Justice Center
10 Main Street
Hackensack, NJ 07601-7968
*LAWYER REFERRAL*
(201) 488-0044
*LEGAL SERVICES*
(201) 487-2166

BURLINGTON COUNTY:
Edward A. Kelly, Jr., Clerk
First Fl., Courts Facility
49 Rancocas Road
Mt. Holley, NJ 08060
*LAWYER REFERRAL*
(609) 261-4862
*LEGAL SERVICES*
(609) 261-1088

CAMDEN COUNTY:
Michael S. Keating, Clerk
First Fl., Hall of Records
501 Fifth Street
Camden, NJ 08103
*LAWYER REFERRAL*
(609) 364-4520
*LEGAL SERVICES*
(609) 364-2010

CAPE MAY COUNTY:
Angela F. Pulvino, Clerk
(Law Division Filings)
Box DN-209
Cape May Courthouse, NJ 08210
or
(General Equity Filings)
Box DN-209A
Cape May Courthouse, NJ 08210
*LAWYER REFERRAL*
(609) 463-0313
*LEGAL SERVICES*
(609) 465-3001

CUMBERLAND COUNTY:
John G. Nardelli, Clerk
Courthouse, Direct Filing
Broad & Fayette Streets
Bridgeton, NJ 08302
*LAWYER REFERRAL*
(609) 452-5291
*LEGAL SERVICES*
(609) 451-0003/935-8024

ESSEX COUNTY:
Patricia McGarry Drake, Clerk
236 Hall of Records
465 Dr. Martin Luther King, Jr. Blvd.
Newark, NJ 07102
*LAWYER REFERRAL*
(201) 533-1779
*LEGAL SERVICES*
(201) 624-4500

GLOUCESTER COUNTY:
Joseph H. Hoffman, Clerk
First Fl., Court House
1 North Broad Street, P.O. Box 129
Woodbury, NJ 08096
*LAWYER REFERRAL*
(609) 848-4589
*LEGAL SERVICES*
(609) 848-5360

HUDSON COUNTY:
Frank E. Rodgers, Clerk
Superior Court, Civil Records Dept.
Brennan Court House
583 Newark Avenue
Jersey City, NJ 07306
*LAWYER REFERRAL*
(201) 798-2727
*LEGAL SERVICES*
(201) 792-6363

HUNTERDON COUNTY:
Dorothy K. Tirpok, Clerk
Hall of Records
71 Main Street
Flemington, NJ 08822
*LAWYER REFERRAL*
(609) 788-6112
*LEGAL SERVICES*
(609) 782-7979

MERCER COUNTY:
Albert E. Driver, Jr., Clerk
P.O. Box 8068
209 South Broad Street
Trenton, NJ 08650
*LAWYER REFERRAL*
(609) 890-6200
*LEGAL SERVICES*
(609) 695-6249

MIDDLESEX COUNTY:
Herbert P. Lashomb, Clerk
Court House, East Wing
Lobby Floor/P.O. Box 2633
One Kennedy Square
New Brunswick, NJ 08903-2633
*LAWYER REFERRAL*
(908) 828-0053
*LEGAL SERVICES*
(908) 249-7600

MONMOUTH COUNTY:
Jane Clayton, Clerk
P.O. Box 1262
Court House, East Wing
Freehold, NJ 07728-1262
*LAWYER REFERRAL*
(908) 431-5544
*LEGAL SERVICES*
(908) 747-7400

MORRIS COUNTY:
Alfonse W. Scerbo, Clerk
CN-900
30 Schuyler Place
Morristown, NJ 07960
*LAWYER REFERRAL*
(201) 267-5882
*LEGAL SERVICES*
(201) 285-6911

OCEAN COUNTY:
M. Dean Haines, Clerk
119 Court House
CN-2191
Toms River, NJ 08754
*LAWYER REFERRAL*
(908) 240-3666
*LEGAL SERVICES*
(908) 371-2727

SOMERSET COUNTY:
R. Peter Widin, Clerk
Civil/General Equity
New Court House, 3rd Floor
P.O. Box 3000
Somerville, NJ 08876
*LAWYER REFERRAL*
(908) 685-2323
*LEGAL SERVICES*
(908) 231-7400

SUSSEX COUNTY:
Helen C. Ackerman, Clerk
Superior Court, Law Division
49 High Street
Newton, NJ 07860
*LAWYER REFERRAL*
(201) 267-5882
*LEGAL SERVICES*
(201) 383-7400

UNION COUNTY:
Walter G. Halpin, Clerk
First Floor, Court House
Elizabeth, NJ 07207
*LAWYER REFERRAL*
(908) 353-4715
*LEGAL SERVICES*
(908) 354-4340

WARREN COUNTY:
Terrance D. Lee, Clerk
Court House
Belvidere, NJ 07823
*LAWYER REFERRAL*
(201) 267-5882
*LEGAL SERVICES*
(201) 475-2010

PASSAIC COUNTY:
William L. Kattak, Clerk
Court House
77 Hamilton Street
Paterson, NJ  07505
*LAWYER REFERRAL*
(201) 278-9223
*LEGAL SERVICES*
(201) 345-7171

SALEM COUNTY:
John W. Cawman, Clerk
92 Market Street, P.O. Box 18
Salem, NJ  08079
*LAWYER REFERRAL*
(609) 678-8363
*LEGAL SERVICES*
(609) 451-0003

ESSEX COUNTY - CIVIL DIVISION
SUPERIOR COURT OF NJ
465 MARTIN LUTHER KING JR BLVD
NEWARK          NJ 07102

                           TRACK ASSIGNMENT NOTICE

COURT TELEPHONE NO. (973) 693-6851
COURT HOURS

               DATE:    FEBRUARY 27, 2006
               RE:      BIOVAIL CORP VS S.A.C. CAPITAL MGMT LLC
               DOCKET: ESX L -001583 06


    THE ABOVE CASE HAS BEEN ASSIGNED TO: TRACK 4.


    DISCOVERY IS PRESUMPTIVELY 450 DAYS BUT MAY BE ENLARGED OR SHORTENED BY THE
JUDGE AND RUNS FROM THE FIRST ANSWER OR 90 DAYS FROM SERVICE ON THE FIRST
DEFENDANT, WHICHEVER COMES FIRST.


    THE MANAGING JUDGE ASSIGNED IS:  HON STEPHEN J. BERNSTEIN


    IF YOU HAVE ANY QUESTIONS, CONTACT TEAM     003
AT:  (973) 693-6443 EXT 6431.


    IF YOU BELIEVE THAT THE TRACK IS INAPPROPRIATE YOU MUST FILE A
CERTIFICATION OF GOOD CAUSE WITHIN 30 DAYS OF THE FILING OF YOUR PLEADING.
    PLAINTIFF MUST SERVE COPIES OF THIS FORM ON ALL OTHER PARTIES IN ACCORDANCE
WITH  R.4:5A-2.
                    ATTENTION:


                         NAGEL RICE & MAZIE LLP
                         103 EISENHOWER PARKWAY
                         ROSELAND        NJ 07068


JUGSHE0

Bruce H. Nagel, Esq.
Jay J. Rice, Esq.
NAGEL RICE & MAZIE, LLP
103 Eisenhower Parkway
Roseland, New Jersey 07068
(973) 618-0400

Marc E. Kasowitz, Esq.
Daniel R. Benson, Esq.
Michael J. Bowe, Esq.
KASOWITZ, BENSON, TORRES & FRIEDMAN LLP
1633 Broadway
New York, New York 10019
(212) 506-1700
ATTORNEYS FOR PLAINTIFFS                                    X

|  |  |
|---|---|
| BIOVAIL CORPORATION and BIOVAIL PHARMACEUTICALS, INC., | SUPERIOR COURT OF NEW JERSEY<br>LAW DIVISION: ESSEX COUNTY<br><br>DOCKET NO. _L-1583-66_ |
| Plaintiffs, |  |
| - against - |  |
|  | Civil Action |
| S.A.C. CAPITAL MANAGEMENT, LLC, S.A.C. CAPITAL ADVISORS, LLC, S.A.C. CAPITAL ASSOCIATES, LLC, S.A.C. HEALTHCO FUNDS, LLC, SIGMA CAPITAL MANAGEMENT, LLC, STEVEN A. COHEN, ARTHUR COHEN, JOSEPH HEALEY, TIMOTHY MCCARTHY, DAVID MARIS, GRADIENT ANALYTICS, INC., CAMELBACK RESEARCH ALLIANCE, INC., JAMES CARR BETTIS, DONN VICKREY, PINNACLE INVESTMENT ADVISORS, LLC, HELIOS EQUITY FUND, LLC, HALLMARK FUNDS, GERSON LEHRMAN GROUP, GERSON LEHRMAN GROUP BROKERAGE SERVICES, LLC, THOMAS LEHRMAN, PATRICK DUFF, JAMES LYLE, and DOES 1 THROUGH 50, | COMPLAINT AND JURY DEMAND<br><br>FEB 2 2 2006 |
| Defendants. |  |

Plaintiffs Biovail Corporation ("Biovail Corp.") and Biovail Pharmaceuticals, Inc. ("BPI" and, together with Biovail Corp., "Biovail"), complaining against defendants S.A.C. Capital Management, LLC ("S.A.C. Capital Management"), S.A.C. Capital Advisors, LLC ("S.A.C. Capital Advisors"), S.A.C. Capital Associates, LLC ("S.A.C. Capital Associates," and together with S.A.C. Capital Management and S.A.C. Capital Advisors, "S.A.C. Capital"), S.A.C. Healthco Funds, LLC ("S.A.C. Healthco"), Sigma Capital Management, LLC ("Sigma"), Steven A. Cohen ("Steven Cohen"), Arthur Cohen, Joseph Healey ("Healey"), Timothy McCarthy ("McCarthy"), David Maris ("Maris"), Gradient Analytics, Inc. ("Gradient"), Camelback Research Alliance, Inc. ("Camelback"), James Carr Bettis ("Bettis"), Donn Vickrey ("Vickrey"), Pinnacle Investment Advisors, LLC ("Pinnacle"), Helios Equity Fund, LLC ("Helios"), Hallmark Funds ("Hallmark"), Gerson Lehrman Group ("Gerson Lehrman"), Gerson Lehrman Group Brokerage Services, LLC ("Gerson Lehrman Brokerage"), Thomas Lehrman ("Lehrman"), Patrick Duff ("Duff"), James Lyle ("Lyle") and Does 1 through 50, say as follows:

## PRELIMINARY STATEMENT

1.      This action arises from a massive, illegal and continuing stock market manipulation scheme, which has targeted and severely harmed Biovail, among other companies, and which has resulted in immense ill-gotten profits for S.A.C. Capital and other extremely powerful hedge funds.

2.      At the core of this scheme was: defendants' preparation of a massive and fraudulent disinformation campaign attacking Biovail and other targeted publicly-traded companies, including the preparation of ostensibly objective, but in fact biased, analyst reports; defendants' accumulation of short positions in the stock of those companies -- i.e., bets that the stock prices would decline; and defendants' subsequent unleashing of the disinformation

2

campaign and biased analyst reports on the unsuspecting trading public -- thus bringing about the sought-after stock price declines and the resulting immense profits for defendants.

3.     Defendants' scheme thus attacked the very basis for the financial markets -- the free and fair disclosure and dissemination of information concerning publicly-traded stocks.

4.     S.A.C. Capital, a hedge fund conglomerate, is at the center of this illegal scheme. S.A.C. Capital was founded and is run by Steven Cohen, who has immense power in the financial markets. Through S.A.C. Capital, Steven Cohen controls at least $7 billion in capital, with his trading activity regularly accounting for 3% of the daily volume of the New York Stock Exchange ("NYSE") and 1% of the NASDAQ daily volume.

5.     Biovail -- one of the scheme's targets -- is a specialty pharmaceutical company specializing in the development, manufacture, and marketing of controlled-release medications for the treatment of chronic medical conditions. Biovail operates facilities in Canada and the United States, including New Jersey, and employs over 1,700 people worldwide.

6.     In spring 2003, when Biovail in fact was poised for substantial growth, S.A.C. Capital and the other defendants launched a devastating attack on Biovail, its business, and its stock. In furtherance of their scheme, after having taken short positions, defendants manipulated the market for Biovail Corp. stock and artificially lowered its stock price by, among other things, disseminating materially false and misleading information concerning Biovail and tortiously interfering with Biovail's business.

7.     One of defendants' primary methods in executing their attack on Biovail (as on other companies) was to "ghost write" negative and false analyst reports concerning Biovail's stock. Defendants issued these reports through Camelback and Gradient, which purported to

3

provide independent securities analysis to subscribers.

8.     In fact, Camelback and Gradient were anything but independent. Instead, Camelback and Gradient permitted hedge fund clients such as S.A.C. Capital to author reports -- nearly always negative -- on companies, and then publicly release the report as a product of its own independent research and analysis. These reports-for-hire were referred to internally at Camelback and Gradient as "hatchet jobs" and typically were released at the behest of short-selling hedge funds.

9.     Biovail provides a prototypical example of defendants' abuse of analyst reports -- an abuse all the more shocking in the wake of recent Wall Street analyst scandals. In June 2003, S.A.C. Capital commissioned a hatchet job on Biovail from Camelback. S.A.C. Capital provided virtually all of the information and opinions found in the report, which grossly distorted and misstated the facts concerning Biovail's business and accounting. The report was merely transcribed by an inexperienced Camelback "analyst" who had only recently graduated college and held no investment analyst credentials. S.A.C. Capital instructed Camelback to hold the report for over a week so that S.A.C. Capital and other defendants could establish short positions in Biovail stock. Camelback then issued the report on June 20, 2003, falsely representing that the content constituted its own independent, unbiased analysis that resulted in an "F" grade for Biovail.

10.    Over the next several weeks, other purportedly independent analysts including defendant Maris, disseminated, at S.A.C. Capital's direction, negative and false information concerning new Biovail drugs, including Wellbutrin XL, and defendants did not stop at false analyst reports. Through defendant Gerson Lehrman, defendants and those with whom they were working in concert went so far as to pay doctors to provide quotes to the financial press

4

falsely implying that Biovail had implemented a program to bribe doctors to prescribe Cardizem
LA. This complete fabrication was disseminated to the financial markets through The Wall
Street Journal and Barron's and subsequently throughout other financial media.

11.     By the end of July 2003, defendants' attack on Biovail was having its intended
effect: in those six weeks, Biovail's stock price declined 20%. Defendants, however, were not
satisfied. S.A.C. Capital had Camelback issue another negative report at the end of July, again
with a false and misleading description of Biovail's business, including the false Gerson
Lehrman reports of bribery, and an additional negative Camelback report in September 2003.

12.     At S.A.C. Capital's further instigation, in early October 2003, Maris of Banc of
America Securities issued two false reports on Biovail based upon the Camelback hatchet jobs.
In an attempt to lend credence to the attacks on Biovail, Maris retained three accounting experts,
who he expected would rubber stamp that attack. When those accountants failed to support his
preconceived conclusions, Maris blatantly misrepresented their findings. Maris's false reports,
together with yet another S.A.C. Capital instigated Camelback hatchet job, led to an additional
14% drop in the stock price of Biovail by October 2003.

13.     Similar orchestrated attacks continued during the spring of 2004 by which time
Biovail's stock had been driven down over 50%, its business reputation devastated, its ability to
access capital markets severely curtailed, its ability to do business substantially impaired, and
hundreds of its employees (including in New Jersey) laid off. In addition to the massive damage
Biovail sustained, investors in Biovail stock were saddled with huge losses, while the short-
selling defendants reaped enormous profits at their expense.

14.     In addition to the attack on Biovail, the scheme was perpetrated against no fewer
than a dozen other companies, including Celgene, Cardinal Healthcare and Biolase.

5

15.     Biovail brings this action to recover no less than $4.6 billion in compensatory damages it has suffered, as well as punitive and treble damages for defendants' egregious misconduct.

## THE PARTIES

16.     Plaintiff Biovail Corp. is a Canadian corporation, whose stock is publicly traded on the NYSE and Toronto Stock Exchange ("TSX"), with its corporate headquarters located at 7150 Mississauga Road, Mississauga, Ontario, Canada.  Plaintiff Biovail Pharmaceuticals, Inc. (BPI), Biovail Corp.'s wholly-owned subsidiary, is a Delaware corporation, with its principal place of business in Bridgewater, New Jersey, and markets Biovail Corp.'s products in Canada, and in the United States, including in New Jersey.

17.     Defendants S.A.C. Capital Associates, S.A.C. Capital Management, and S.A.C. Capital Advisors, directly or indirectly, operate and manage various hedge funds (including defendants S.A.C. Healthco and Sigma), are organized under the laws of Delaware, and maintain their principal places of business at 72 Cummings Point Road, Stamford, Connecticut.

18.     Defendant S.A.C. Healthco is a hedge fund organized under the laws of Anguilla, British West Indies, with its principal place of business at 540 Madison Avenue, New York, New York.

19.     Defendant Sigma is a hedge fund organized under the laws of Delaware, with its principal place of business at 540 Madison Avenue, New York, New York.

20.     Defendant Steven Cohen is a citizen and resident of Connecticut, and resides at 30 Crown Lane, Greenwich, Connecticut.  Steven Cohen is the founder and operator of S.A.C. Capital Associates, S.A.C. Capital Management, S.A.C. Capital Advisors, Sigma, S.A.C.

6

Healthco, and various other hedge funds that he owns, controls, or otherwise directly or indirectly operates. Steven Cohen controls, dominates, and operates such hedge funds without regard to the putatively separate legal form and existences of each such that each is the alter ego of the other and of Steven Cohen. In addition, as set forth herein, Steven Cohen and S.A.C. Capital abused the corporate form by using the entities they control and operate to perpetrate a fraud and injustice.

21.     Defendant Healey is a citizen and resident of New York residing at 17 East 17th Street, New York, New York. During the times relevant to this complaint, he was a manager of S.A.C. Healthco operating under the direct direction and control of Steven Cohen. Healey has since left S.A.C. Healthco to form and operate a hedge fund called Healthcor that is, directly or indirectly, 40% owned by Steven Cohen and the hedge funds he manages.

22.     Defendant Arthur Cohen is a citizen and resident of Connecticut residing at 67 Old Hill Road, Westport, Connecticut. During the times relevant to this complaint, Arthur Cohen, along with Healey, managed S.A.C. Healthco under the direct direction of Steven Cohen. Arthur Cohen has since left S.A.C. Healthco to form and operate a hedge fund called Healthcor that is, directly or indirectly, 40% owned by Steven Cohen and the hedge funds he manages. Prior to working at S.A.C. Healthco, Arthur Cohen was employed at Tiger Management, a hedge fund engaged in substantial "short selling" of stock that was dissolved on or about March 30, 2000.

23.     Defendant McCarthy is a citizen and resident of New York residing at 140 East 36th Street, New York, New York. From early 2003 through early 2005, McCarthy worked at S.A.C. Healthco under the direction of defendants Healey and Arthur Cohen and Steven Cohen. Prior to working at S.A.C. Healthco, McCarthy worked with defendant Maris at Credit Suisse

7

First Boston ("CSFB"). In early 2005, McCarthy left S.A.C. Healthco to return to CSFB, where he is currently employed. (Defendants S.A.C. Capital Associates, S.A.C. Capital Management, S.A.C. Capital Advisors, Sigma, S.A.C. Healthco, Steven Cohen, Arthur Cohen, Healey, and McCarthy are collectively referred to herein as the "S.A.C. Defendants" or "S.A.C.")

24.     Defendant Maris is a citizen and resident of the state of New Jersey residing at 77 Vardon Way, Farmingdale, New Jersey. Maris is the Banc of America Securities analyst covering specialty pharmaceuticals, including Biovail, and prior to joining Banc of America Securities in 2003, Maris worked at CSFB with defendant McCarthy.

25.     Defendant Gradient is an Arizona corporation, with its principal places of business during the time period alleged in this complaint located at 14614 North Kierland Boulevard, Scottsdale, Arizona and Summit, New Jersey.

26.     Defendant Camelback is an Arizona corporation, with principal places of business during the time period alleged in this complaint located at 14614 North Kierland Boulevard, Scottsdale, Arizona and Summit, New Jersey. Camelback is wholly-owned, operated, dominated, and controlled by defendants Gradient, Bettis, and Vickrey without regard to the putatively separate legal form and existence of each such that each is the alter ego of the other. In addition, as set forth herein, Gradient, Bettis, and Vickrey abused the corporate form by using Camelback and the other entities they control and operate to perpetrate a fraud and injustice.

27.     Defendant Pinnacle is a hedge fund organized under the laws of Arizona, with its principal place of business located at 14614 North Kierland Boulevard, Suite S-260, Scottsdale, Arizona.

28.     Defendant Helios is a hedge fund organized under the laws of Arizona, with its

8

principal place of business located at 14614 North Kierland Boulevard, Suite S-260, Scottsdale, Arizona.

29.     Defendant Hallmark Fund is a hedge fund organized under the laws of Arizona, with its principal place of business located at 14614 North Kierland Boulevard, Suite S-260, Scottsdale, Arizona.

30.     Defendant Bettis is a founder, co-owner, President, and CEO of defendants Camelback and Gradient. Bettis is a citizen and resident of the state of Arizona residing at 9820 East Thompson Peak Parkway, Unit #608, Scottsdale, Arizona. In addition, Bettis is a founder, owner, investor, and manager of various hedge funds and hedge fund advisors, including defendants Pinnacle, Helios, and Hallmark.

31.     Defendant Vickrey is a founder and co-owner of defendants Camelback and Gradient, and an officer and the Editor-in-Chief of Camelback. Vickrey is also a founder, owner, investor, manager, and advisor of various hedge funds, including defendants Pinnacle, Helios, and Hallmark. Vickrey is a citizen and resident of the state of California residing at 7345 Corte Tomillo, Carlsbad, California. (Defendants Gradient, Camelback, Bettis, Vickrey, Pinnacle, Helios, and Hallmark are collectively referred to herein as the "Camelback Defendants.")

32.     Defendant Gerson Lehrman is a Delaware corporation, with its principal place of business at 850 Third Avenue, New York, New York. Gerson Lehrman acts as a "matchmaker" between a network of individuals and entities with experience and expertise in a broad range of disciplines and clients who seek to consult with those experts.

33.     Defendant Gerson Lehrman Brokerage is a New York limited liability company,

9

with its principal place of business at 850 Third Avenue, New York, New York. Gerson Lehrman Brokerage provides trading and financial services to Gerson Lehrman, its founders, and its clients.

34.   Defendant Lehrman is a co-founder of Gerson Lehrman and a former Gerson Lehrman co-CEO and director. Prior to founding Gerson Lehrman, Lehrman worked for Tiger Management. Lehrman is a citizen and resident of the District of Columbia residing at 4401 Dexter Street Northwest, Washington, D.C.

35.   Defendant Duff is a managing director of Gerson Lehrman. Duff resides at 275 Durham Place, Glen Rock, New Jersey. Prior to joining Gerson Lehrman, Duff was a Senior Managing Director and Management Committee member at Tiger Management where he worked closely with Defendant Arthur Cohen.

36.   Defendant Lyle is a founder and managing director of Gerson Lehrman and a former Managing Director of Tiger Management. Lyle resides at 20 East 9th Street, New York, New York. (Defendants Gerson Lehrman, Gerson Lehrman Brokerage, Lehrman, Duff, and Lyle are collectively referred to herein as the "Gerson Lehrman Defendants.")

37.   The names and capacities of defendants Does 1 through 50 are presently unknown to plaintiffs. Plaintiffs are informed and believe that Does 1 through 50 include the limited and general partners of the other defendants, including the S.A.C. Defendants, as well as affiliates, co-venturers, co-conspirators, and/or aiders and abettors of the other defendants. Plaintiffs also are informed and believe that Does 1 through 50 include unknown Canadian and American financial analysts and portfolio managers who participated in the scheme, enterprise, and misconduct alleged in this complaint.

10

38.    Plaintiffs and numerous defendants regularly conduct business in the County of Essex in the state of New Jersey.

## STATEMENT OF FACTS

### A.    The Illegal Scheme

39.    This action arises from a massive, illegal and continuing stock market manipulation scheme, which has targeted and severely harmed Biovail, among other companies, and which has resulted in immense ill-gotten profits for S.A.C. and the other defendants.

40.    A critical element of the scheme was and remains "short-selling." A "short seller" or "short" borrows stock from a lender and sells the borrowed stock, expecting that the price of the stock will decline, and that he will therefore be able to purchase the stock later at a lower price, return the stock to the lender and pocket the profit. The scheme also employed various "short-equivalent" trading strategies -- such as the purchase of "put" options -- that likewise profited from future declines in the stock price of targeted companies. Under the scheme, the defendants, in concert with one another and others, drove down the price of stocks they had shorted or in which they had assumed short equivalent trading positions by, among other means, disseminating materially false and misleading information, orchestrating negative news articles, commissioning, "ghost writing" or influencing negative reports from biased and corrupted stock analysts, and using such manufactured misinformation to engender investor suspicion and legal and regulatory scrutiny.

41.    The defendants, in concert with one another and others, also exploited advance access to material non-public confidential information that was shared with them in violation of various fiduciary relationships or otherwise misappropriated, including, for example, information concerning certain FDA drug approval decisions, the timing of company product launches or

11

business developments, trading and other investment activities of clients, and the timing and substance of stock analyst recommendations. The defendants traded on such material non-public information by shorting stocks before the release of unfavorable information, reducing short positions and/or taking long positions before the release of positive information, and executing various trading strategies otherwise designed to exploit trading volume and volatility surrounding the release of the anticipated information. For example, as set forth in detail below, the defendants, in concert with one another and others, ghost-wrote purportedly independent analyst reports which were then held before release until the defendants could take short and other trading positions based on the report's expected impact upon release and also regularly received advance notice of the timing and substance of other analyst reports -- which were similarly tailored to suit the defendants' trading objectives -- to enable them to likewise "front run" the release of those reports.

42.     This scheme targeted many dozens and likely hundreds of publicly-traded companies, including Biovail. These targeted companies suffered enormous damage as a direct consequence of the scheme, which directly and materially interfered with each company's ability to conduct business, implement strategic plans, secure necessary capital, and maintain employee morale, productivity, and recruiting. In addition, and equally severe, the scheme inflicted enormous financial harm on investors in the targeted companies who collectively lost many billions of dollars as a direct consequence of this stock manipulation scheme -- billions of dollars lost to the defendants who reaped correspondingly enormous profits at the expense of those innocent investors.

B.      The Criminal Enterprise

43.     This illegal stock manipulation scheme was devised and executed by an

12

association, associations, and associations-in-fact comprised of, among others, the S.A.C. Defendants, the Camelback Defendants, the Gerson Lehrman Defendants, defendant Maris, the Doe defendants, and others known and unknown (collectively, the "Enterprise"), including the following:

1.    The S.A.C. Defendants

44.    S.A.C. derives its name from the initials of its founder and leader Steven A. Cohen. Steven Cohen is known in the industry as the "most powerful trader on Wall Street you've never heard of" because of the "highly secretive and stupendously successful S.A.C. funds he controls." Through S.A.C., Steven Cohen collectively controls no less than $7 billion and regularly accounts for 3% of the NYSE daily volume and 1% of the NASDAQ daily volume. These investment dollars are channeled through several different "portfolio companies" or funds -- including a core fund, a global diversified fund, a health-care fund, and defendant Sigma fund (comprised of Steven Cohen's personal monies), all of which Steven Cohen manages in a highly integrated and hands-on fashion.

45.    Steven Cohen's market influence, however, extends much further than the S.A.C. funds he directly controls. In addition to the billions he controls directly through S.A.C., he has also invested billions more in non-S.A.C. funds, including funds formed by former S.A.C. managers who are required to agree as a condition of S.A.C. employment to permit Cohen to hold up to a 50% interest in any hedge funds they form after leaving S.A.C. Consequently, Cohen personally has one of, if not the, most powerful market-moving capabilities on Wall Street.

46.    In the first 12 years since he formed S.A.C. Capital Advisors, Steven Cohen had regularly generated incredible returns in the range of 40% per annum. Reflecting this

13

extraordinary performance, investors pay him a 50% success fee, far above the 20% industry standard. Consequently, Steven Cohen's annual S.A.C. management fee regularly has exceeded $400 million, which is in addition to profit he earns on his own monies invested in Sigma and other S.A.C. and non-S.A.C. funds. As is explained hereafter, the notable exception to S.A.C.'s extraordinary success occurred in 2002, when its returns declined from approximately 40% per annum to approximately 14% and Steven Cohen's fees plummeted to "only" $100 million.

47.     Unlike most hedge funds, S.A.C. seeks no volume discount on its enormous trading costs and commissions, and consequently pays over $150 million in annual commissions -- making it one of Wall Street's top ten trading customers. In addition, S.A.C. frequently purchases secondary offerings, that include substantial built-in brokerage commissions for banks, and thereby further increases S.A.C.'s already substantial financial leverage and influence. Cohen uses this enormous financial leverage to support S.A.C.'s trading strategies by demanding access to material non-public information from the financial institutions with whom S.A.C. does business, including non-public inside information concerning public companies and other clients to whom those institutions owe fiduciary and other duties of non-disclosure, and the substance and timing of reports and recommendations being issued by analysts for those institutions. Financial institutions and their employees understand -- because S.A.C. has told them -- that a failure to provide such information will result in the loss of S.A.C.'s substantial business.

48.     S.A.C. uses its enormous financial leverage to not only extract and trade on material non-public information but also to actually dictate the substance and timing of certain material information being disseminated to the market. For example, S.A.C. regularly uses its substantial financial leverage to direct and influence the analysis and recommendations of purportedly independent stock analysts and the time such analysis and recommendations are

14

issued to the market, without any disclosure of the material conflict of interest reflected by its leverage and influence. Like S.A.C.'s demand for material non-public information, it is understood that failing to provide influence and control over the substance and timing of analyst reports will result in the loss of S.A.C.'s substantial business.

49.    To maximize the impact of its access to material non-public information and control and influence over the substance and timing of analyst reports, S.A.C. focuses on thinly-traded, small to modestly capitalized stocks in volatile sectors like pharmaceuticals and bio-technology. Stock prices in these sectors are more easily manipulated and special advanced access to, and influence over, information is more readily exploited because of the lower market capitalizations and trading volumes in these sectors, as well as the fact that stock prices depend heavily on intangibles and unknowns such as the outcomes of clinical trials and new product launches. S.A.C. rarely invests in such companies long-term but instead pursues short-selling or event-driven trading strategies based on S.A.C.'s access to -- and control over -- material non-public information, and the substance and timing of stock analyst reports.

50.    To maximize the use of S.A.C.'s substantial market influence, under Steven Cohen's direction, S.A.C. places extreme pressure on its traders, managers, employees, and agents to produce at all costs. S.A.C. generates such intense pressure by, among other things, imposing what is described internally at S.A.C. as an "eat what you kill" compensation scheme under which compensation depends on individual trading performance and not -- as is the industry norm -- on the fund's overall performance. Those who fail to produce are quickly terminated: "At S.A.C., you either perform or you're dead," according to one public report by an insider. Such policies ensure that those who remain at S.A.C. are willing and capable of doing whatever it takes to secure the extraordinary performance Steven Cohen demands. The

15

enormous pressure to perform at S.A.C. was particularly acute in 2003 after Cohen had experienced what insiders called his "very disappointing" 14% returns and $100 million in management fees in 2002.

51.     From spring 2003 to the present -- as it had in the past -- the S.A.C. Defendants orchestrated short-selling "bear attacks" on numerous publicly traded companies, including Biovail. They prosecuted these attacks on Biovail and other targeted companies by, among other things, paying, pressuring, and otherwise influencing purportedly independent analysts to disseminate materially false and misleading information about the business, accounting, and corporate governance of these targeted companies. These materially misleading misinformation campaigns devastated the targeted companies by tarring their business reputations, eroding investor confidence, and devastating management and employee morale and focus, and thereby artificially driving down the stock price to the enormous benefit of the short-selling S.A.C. and the extreme detriment of the companies and their legitimate investors.

2.     The Camelback Defendants

52.     In the wake of the scandals, lawsuits, and regulatory investigations involving corrupt stock analysts issuing untrue reports to support their financial institution's investment banking business, a new niche of third-party boutique firms emerged claiming to provide purportedly "independent" stock analysis. Defendants Bettis and Vickrey attempted to exploit this emerging market niche by forming, owning, and operating defendants Camelback and Gradient. Bettis and Vickrey promoted Camelback and Gradient as, among other things, "independent research firm[s] providing both analyst-written research work (Earnings Quality Analytics and Equity Incentive Analytics) and quantitative stock ratings for institutional clients (Gradient Factor Suite)." Consistent with this description, the Camelback Defendants

16

represented that their reports and analyses -- which purported to focus on earnings and forensic accounting issues -- were the work product of an experienced staff of CPA's, CFA's, M.B.A.'s and Ph.D.'s, "reflect[ed] [their] judgment" and were completely "independent" and free from "bias." Indeed, they applied for and received certifications from industry organizations representing that they were independent of investment banking services, money management, or customized research services. In addition, they represented that all of their clients had equal access to their reports, which they represented were released to all clients simultaneously immediately upon completion.

53.     In truth, however, the Camelback Defendants' service was a sham and such representations were false. Their quantitative models -- which purported to calculate investment ratings based on various financial data and mathematical programs -- were knowingly operated with unreliable and incomplete data feeds and without the most fundamental programming safeguards necessary for basic quality control and reliability. Despite repeated warnings from internal and external experts concerning the need for such stringent data quality safeguards, Bettis and Vickrey refused to implement such safeguards because doing so would have interfered with one of their central marketing objectives of maximizing the number of companies covered (however badly) so as to provide the greatest possible likelihood that they could point to successful (albeit truly random) price movement predictions. Indeed, employees referred to the Camelback Defendants' quantitative models internally as "the random number generator" because they typically got as many calls wrong as right. Indeed, defendant Bettis quickly abandoned the use of Camelback's core "earnings quality" quantitative model in his management of defendants Pinnacle, Helios, and Hallmark, even though the Camelback Defendants continued to promote that model to the investors as an effective stock selection tool.

17

54.  The Camelback Defendants' qualitative analyst reports were even more misleading. As a threshold matter, the purported staff of so-called "analysts" preparing these reports were not experienced CPA's, CFA's, M.B.A.'s, or Ph.D.'s as represented but recent college graduates with no meaningful, let alone remotely adequate, experience in forensic accounting or investment analysis. The Camelback Defendants required no such experience, however, because, like the quantitative models, they were not interested in the accuracy of their reports but instead only in their ability to generate business by marketing a large library of reports so as to also secure putatively correct (albeit entirely random) performance predictions.

55.  In addition, the reports were hardly the product of "independent" unbiased accounting or other analysis for a host of reasons. First, the Camelback Defendants lied to customers and other market participants that they did not manage money. In fact, while issuing their purportedly independent and unbiased research, Bettis and Vickrey were also managing the Pinnacle, Helios, and Hallmark hedge funds from the offices of Camelback and Gradient and trading in the very stocks they were covering through those funds and personally. Indeed, one desk in the Camelback/Gradient office had a phone for Camelback and Gradient research customers at one end and a phone at the other end of the same desk for clients of these hedge funds Bettis, Vickrey, and other Camelback and Gradient employees were managing.

56.  Furthermore, the reports they issued were almost exclusively negative to suit their core business objective of servicing short-selling hedge funds interested in driving stock prices down. In order to secure such clients, the Camelback Defendants permitted hedge funds to "ghost write" so-called "custom" reports that were referred to internally by certain Camelback employees and externally by certain hedge fund customers as "hatchet jobs." When a custom report was ordered, the hedge fund client told the putative Camelback "analyst" what issues to

18

write about and what to say about those issues. The "analyst" contributed no meaningful analysis to the report but merely served as a scrivener of the client's stated position. That the reports were not legitimate unbiased research or reflected the Camelback Defendants' true beliefs or honest opinions was apparent from numerous facts, including the fact that the short-selling hedge funds dictated all or substantially all of the information and conclusions contained in the reports, and target companies were never asked to comment on, explain, or clarify any of the concerns or uncertainties frequently raised by the reports.

57.     The Camelback Defendants also misrepresented that reports were issued simultaneously to all clients upon completion. In fact, once completed, a customized hatchet job would be held until the commissioning hedge fund instructed that it be released. This delay was to allow the paying hedge fund and others it was working with (and the hedge funds controlled by Bettis and Vickrey, including defendants Pinnacle, Helios, and Hallmark, as well as Bettis and Vickrey personally) to front-run the reports by taking short and other positions in anticipation of their release contrary to their representations to their clients. Only after the hedge fund instructed the Camelback Defendants to release the reports were they sent to the other Camelback/Gradient clients.

58.     In promoting their "custom" service to short-selling hedge funds, the Camelback Defendants touted their ability to amplify the impact of the negative reports through various contacts. In order to maximize the negative impact of these putative analyst reports, the Camelback Defendants would also send the reports to the targeted company's largest shareholders through a subscription service called BigDough.com and to a stable of financial media outlets and journalists receptive to rebroadcasting the content of the reports. Indeed, the Camelback Defendants aggressively courted media outlets to promote their analysis and the

19

interests of their short-selling clients. For example, Camelback/Gradient clients and Enterprise members John Rocker and Rocker Partners own 10% of the influential internet site TheStreet.com, which frequently cited Camelback/Gradient reports, including those that had been ghost written or otherwise influenced by short-selling hedge funds including Rocker Partners. Moreover, current MarketWatch contributor Jon Markman was a paid investment advisor for the Pinnacle hedge fund operated by the Camelback Defendants, promoted their analysis in his writing, and co-authored a subscription stock selection newsletter with Bettis. Likewise, other influential financial columnists had close relationships with Vickrey, remote access to Camelback's website and internal data, and frequently spoke with Vickrey and Bettis while writing about companies about which the Camelback Defendants had issued "customized" reports for short-selling hedge funds.

59.    Well-informed shareholders of targeted companies who received unsolicited copies of these bogus research reports frequently responded with outrage at the report's obvious reckless disregard for the truth. In many other cases, however, the reports had the desired effect of causing shareholders to reduce or liquidate their positions. For example, as set forth below, hatchet jobs S.A.C. commissioned on Biovail caused one of its top three institutional shareholders to liquidate its entire position and other substantial strain on Biovail's investor confidence. The Camelback Defendants celebrated these developments internally as great achievements and used them to demonstrate the effectiveness of their custom hatchet jobs to other hedge funds from whom they were seeking business.

60.    The Camelback Defendants permitted hedge funds to use their names to ghost-write custom reports for several reasons. First, custom "hatchet jobs" provided a source of revenue and business development that they realized was not otherwise available to them for

20

truly independent and objective "forensic accounting" analysis. Second, participating in such manipulative schemes allowed them to also "front-run" the market movement that their reports and the efforts of these powerful short-selling hedge funds would cause. Third, doing work for major market participants such as S.A.C. made it easier to promote their services to other potentially interested financial institutions.

61.     This marketing strategy was successful. As set forth below, after a series of S.A.C. hatchet jobs on Biovail and other pharmaceutical and biotechnology companies that were ghost written by S.A.C. Healthco manager and defendant McCarthy, Steven Cohen personally called the Camelback Defendants to express his gratitude for their work and S.A.C.'s intention to expand the relationship going forward. In addition, the Camelback Defendants began providing custom hatchet jobs for numerous other hedge funds. These hatchet jobs, ghost written or substantially influenced by short-selling hedge funds, include reports on, among others, Celgene, Cardinal Healthcare, Inc., Intermune, Inc., ImPath, Inc., Biolase, Take-Two Entertainment, Leap Frog, King Pharmaceuticals, Inc., Accredo Health, Inc., Swift Transportation Co., Overstock.com, and Taser.

62.     The Camelback Defendants also used their custom service to develop securities class action law firms as clients. The hatchet jobs issued by the Camelback Defendants served the interests of these class action law firms by artificially driving the stock price of targeted companies down and preventing or substantially diminishing any potential recovery in the stock price. Indeed, many of the plaintiffs represented by these firms were short-selling funds who were hoping for and frequently attempting to manufacture the very price drops that would then form the basis for the suit. Moreover, some of these firms used the Camelback reports as cookie-cutter roadmaps for drafting class action complaints based on those manufactured stock drops

21

and paid the Camelback Defendants lucrative expert witness and consulting fees to support their litigation positions in such lawsuits.

63.    Numerous employees of the Camelback Defendants raised concerns about the misrepresentations being made about analyst credentials, the mischaracterized lack of any financial interest in the stocks being covered, the lack of reliability in the trading models, the lack of objectivity in the customized reports, and the holding of reports for select hedge fund clients. Although defendants Vickrey and Bettis acknowledged internally the inappropriateness of such practices when confronted by such complaints, the only action they took was to ultimately orchestrate the discharge (on complete pretenses) of those raising such objections to silence discord concerning what they had determined would be a central part of the Camelback/Gradient business.

3.    **David Maris**

64.    David Maris is currently the Banc of America Securities analyst covering specialty pharmaceuticals. Prior to joining Banc of America Securities in 2003, Maris worked at Credit Suisse First Boston ("CSFB") with defendant McCarthy. Maris has built a reputation as a powerful "sell-side" securities analyst whose negative reports can devastate a company's stock price. This reputation is based in part on his critical coverage of Irish pharmaceutical company Elan, whose financial troubles and declining stock price made enormous profits for short-selling hedge funds, including Tiger Management at which S.A.C. Healthco manager Arthur Cohen and Gerson Lehrman's Thomas Lehrman and James Lyle worked together at the time. Maris is a favorite of short-selling hedge funds who view him as a strong ally and voice in their efforts to drive down stock prices in targeted companies by disseminating negative information and analysis about those companies. Maris also views these short sellers as allies in that they are

frequently large clients of Banc of America Securities, provide him with material non-public information for use in his reports and otherwise with his Banc of America Securities clients, and because it is in both Maris's and the short sellers' interests to see the price decline in companies they have targeted for criticism or sold short, respectively.

65.    After Maris joined Banc of America Securities and McCarthy began working at S.A.C. Healthco, they continued to work together and collaborate with respect to the work McCarthy was doing at S.A.C. One of the stocks they collaborated on was Biovail, which Maris understood S.A.C. and other larger hedge fund clients of Banc of America Securities were targeting for a prolonged short-selling attack beginning in or about June 2003. As part of their collaboration, Maris provided McCarthy with special advanced access to, and input into, his research reports and internal analysis and advance notice of the timing and substance of those reports before they were issued. In addition, he disseminated a stream of grossly misleading information and analysis in frequent written and oral reports, on the internet, at investor conferences, and in direct and indirect communications with investors, the press, and regulators.

66.    Maris undertook such actions because (a) he hoped to be credited and compensated by Banc of America Securities with bringing in or maintaining lucrative hedge fund business, including from, among others, S.A.C., Itros Capital, SuttonBrook Capital, Ram Partners, and Ziff Brothers Investments, all of whom he understood were shorting Biovail; (b) these and similar short-selling hedge funds shared with him material non-public information they had secured by exercising their substantial financial leverage that he could use to make his recommendations appear more prescient; and (c) he understood that Biovail was about to be the subject of a concerted short attack by these and other powerful hedge funds and saw enlisting in

23

this assault as an opportunity to repeat his career-making performance with Elan and further solidify his self-proclaimed title of "the Howard Stern of Wall Street."

### 4.    The Gerson Lehrman Defendants

67.    Gerson Lehrman promotes itself as a company that "provides customized research services for knowledge-driven businesses" and is known in the hedge fund industry as a "matchmaker" and information conduit. In exchange for substantial sums of money, Gerson Lehrman puts hedge funds in contact with, or communicates on behalf of hedge funds with, numerous persons and entities in various disciplines. Although such services can constitute entirely legitimate due diligence, Gerson Lehrman also frequently facilitates both the illegal collection of material inside information for trading purposes and the dissemination of false and misleading information for illegal market manipulation purposes.

68.    For example, Gerson Lehrman regularly matches hedge funds with, or communicates on their behalf with, doctors involved in clinical trials, the results of which will determine whether a pharmaceutical will receive FDA approval or not. From these discussions, Gerson Lehrman and its hedge fund clients frequently secure material non-public information concerning the likelihood of FDA approval and use that information in their trading strategies in that company's stock. Conversely, Gerson Lehrman regularly works with hedge funds that are shorting stocks to manufacture negative information about the companies being shorted and disseminate that information into the market to manipulate a company stock price downward.

69.    With respect to Biovail, Gerson Lehrman on behalf of its hedge fund clients orchestrated the publication of at least two negative and inaccurate articles that appeared virtually simultaneously in The Wall Street Journal and Barron's concerning the Cardizem LA launch, a product central to Biovail's strategic business plan. Although the articles purported to

24

be the product of independent journalistic research and honest medical opinions, the doctors critically quoted in the articles were -- unbeknownst to the authors -- employed by hedge funds (most or all through Gerson Lehrman). Indeed, the most critical doctor quoted inexplicably appeared in both articles and misrepresented in each that he had been approached by Biovail and asked to accept payments (i.e., bribes) to prescribe Cardizem LA.

70.     In addition to its affiliated activities on behalf of hedge funds, the Gerson Lehrman Defendants engage in front-running and insider trading -- individually and through Gerson Lehrman Brokerage Services -- by engaging in stock trading based on the information they receive on behalf of, and from, clients, and their understanding of the clients' expected trading plans.

    5.     Perry Capital

71.     Perry Capital is a hedge fund operating in New York, New York. Perry Capital is a client of the Camelback Defendants and Gerson Lehrman. During the summer of 2003, Perry Capital acquired more than one million put options on Biovail stock and was paying doctors through Gerson Lehrman who were being quoted critically in the negative Barron's and Wall Street Journal articles concerning Cardizem LA. In January 2006, the SEC notified Perry Capital that it was contemplating an enforcement action based on Perry Capital's manipulative short-selling of securities.

    6.     The Rocker Enterprise Members

72.     John Rocker is the primary owner and manager of hedge fund Rocker Partners operating in Millburn, New Jersey. Rocker Partners is a Camelback client that has ordered "hatchet jobs" to support short positions on numerous companies including Overstock.com, and participated in the manipulative short-selling by other Enterprise members. John Rocker is also

25

the largest shareholder in the financial news and commentary website TheStreet.com, which frequently rebroadcasts reports and analysis of the Camelback Defendants -- including those commissioned by Rocker on companies he and his fund are shorting -- and frequently quotes Bettis and Vickrey concerning companies being shorted by members of the Enterprise.

### 7.    Other Enterprise Members

73.    The Enterprise also includes other members known and unknown who participated in and facilitated the scheme, including but not limited to Canadian stock analyst Andre Uddin, who collaborated with the S.A.C. Defendants and the Camelback Defendants with respect to Biovail, Itros Capital, SuttonBrook Capital, Ram Partners, and Ziff Brothers Investments, all of which collaborated closely with Maris and in some cases the Camelback Defendants.

### C.    Biovail

74.    Biovail is Canada's largest pharmaceutical company based on market capitalization. At times relevant to this complaint, it developed and marketed products in the cardiovascular, central nervous system, and pain management therapeutic areas, and had particular expertise in oral controlled, extended-release drug delivery technology. At times relevant to this complaint, Biovail's product portfolio contained over twenty-five pharmaceuticals including hypertension drugs Cardizem CD and Cardizem LA; angiotension converting enzyme inhibitors (Vasotec and Vaseretic); Ultram ER; topical herpes treatment Zovirax; and extended release anti-depressant Wellbutrin XL. Through early 2002, Biovail had predominately marketed its products in the United States by licensing them to U.S.-based third party marketing organizations. Based on this successful business model and ongoing opportunistic acquisitions of new product rights, Biovail grew steadily, with revenues increasing

26

from $112 million in 1998 to $788 million in 2002.

75.     In early 2002, Biovail was again poised for growth and was developing its own sales and marketing capability that would provide a fully-integrated business platform for exponentially greater future growth. Central to these immediate and longer-term objectives was Biovail's planned launch of an improved version of hypertension drug Cardizem CD, which was called Cardizem LA. The financial markets considered Cardizem LA financially and "psychologically critical" to Biovail for at least two reasons. First, a successful Cardizem LA launch would further substantiate Biovail's controlled release technology and department strategy. Second, a success would substantially blunt if not reverse the anticipated erosion in Cardizem CD sales from increasing generic competition. Third, Cardizem LA was slated to be Biovail's first substantial effort at fully-integrated operations.

76.     Given the critical importance of the Cardizem LA launch, in the summer 2002 Biovail retained the international consulting firm of McKinsey & Company ("McKinsey") to assist in devising a successful product launch. McKinsey's brief was broad and its efforts substantial. It assembled a full-time on-site project team consisting of McKinsey professionals and Biovail representatives and immediately assumed definitive hands-on management control over all aspects of the Cardizem LA launch, including responsibility for developing sales, and operational strategies, reorganizing Biovail's sales forces, and centralizing that force at the headquarters of BPI in Bridgewater, New Jersey.

77.     By summer end, McKinsey had determined that Cardizem LA's long-term success would be substantially improved by a post-launch clinical global trial research study that would gather real-world clinical data demonstrating its effectiveness. Because Biovail had no experience in such programs, McKinsey recommended that it retain a firm that did. After

27

considering proposals from leading firms in the field, McKinsey recommended retaining Quintiles Transactional Corporation ("Quintiles") because it was the preeminent firm in the field with the most relevant experience. Biovail accepted that recommendation and authorized Quintiles to develop every element of the clinical experience research program. As it had with McKinsey, the company made clear it intended to rely on Quintiles' recommendations once they had been fully reviewed, vetted, commented on, and approved by McKinsey.

78.    Quintiles ultimately recommended a program whereby physicians matching certain profiles could participate in a Cardizem LA clinical experience research study involving up to 15 of their patients, each of whom would receive coupons for a free supply of the drug for participating in the program. Quintiles also informed Biovail that participating physicians and staff should be offered fair market compensation for the time they spent administering the program and compiling and recording the requested data. Consequently, with the advice of McKinsey and other outside legal and medical experts, the program provided a $250 administrative fee to physicians for completing the baseline questionnaire and consulting agreement, up to no more than $1,000 for the physician's participation assuming a maximum of 15 patients entered and completed the program (earned in installments as program milestones were attained), and an additional $50 for office personnel. The clinical experience research program was called "Proving LA through Clinical Experience" or "PLACE" for short.

79.    After the extraordinary effort and costs developing and vetting the PLACE program, Biovail announced in March 2003 that Cardizem LA would be launched the following month. At that launch, the PLACE program and Cardizem LA's importance to Biovail's future were emphasized. With the Canadian launch the previous month of an improved version of Teveten (Teveten HCT), an April Cardizem LA launch, a May acquisition of Ativan, the July

launch of Zovirax cream, and the expected imminent approval and launch of other new and improved products, especially an extended-release version of anti-depressant Wellbutrin (Wellbutrin XL), Biovail was uniquely poised for substantial growth and the start of fully-integrated operations. Indeed, the market's reaction to these many positive developments pushed Biovail's stock price to a 52-week high of over $50 in early June 2003 with analysts calling it "an exciting growth play," predicting it would hit $60 in the next year, and rating it "accumulate."

D.    The Biovail Bear Raid

80.    As Biovail's stock price rose to a 52-week high, the Enterprise targeted Biovail for an illegal short-selling attack. The Enterprise targeted Biovail because of its rising stock price and the fact that it was particularly vulnerable to the Enterprise's scheme due to its moderate market capitalization and trading volume, volatile market sector, business complexity, and the importance of its new product launches and associated strategic initiatives. Under these circumstances, the Enterprise understood that it could cause a substantial decline in Biovail's stock price and generate substantial trading volatility and volume by manufacturing false concerns and doubts in the market about Biovail's business, accounting, and products.

81.    Accordingly, the Enterprise commenced a concerted misinformation campaign in which its members disseminated bogus analyst reports; manufactured grossly misleading and untrue press; spread false rumors and misinformation about Biovail's business fundamentals, accounting, and insiders; and took various steps with that misinformation to generate regulatory scrutiny. Central to the scheme was the plan to use trumped-up false and misleading criticisms of Biovail's accounting and business practices to undermine investor confidence despite strong business prospects that the Enterprise could not effectively assail. The members of the Enterprise that took the lead in this campaign were, among others, the S.A.C. Defendants, the

29

Camelback Defendants, Maris, Perry Capital, and the Gerson Lehrman Defendants.

1.    The Bogus June Camelback Report and Regulatory Rumors

82.    The scheme to undermine investor confidence in Biovail and its business by spreading unfounded criticisms about its accounting and business practices began in or around Spring 2003. These efforts initially manifested themselves in various false and misleading market rumors that began to appear at that time, including rumors of non-existent investigations into Biovail's accounting and negative rumors concerning Cardizem LA sales practices. At the same time, S.A.C. and the Camelback Defendants agreed to issue putative Camelback research reports highly critical of Biovail's accounting and business that would actually be ghost-written by defendant McCarthy on behalf of S.A.C. In early June, McCarthy dictated virtually all of the information and opinions to be included in the first of these Biovail "hatchet jobs" to a young inexperienced Camelback "analyst" with no investment analyst credentials or material forensic accounting experience. A draft report containing McCarthy's dictated analysis bearing a legend indicating that it reflected the client's position was sent to McCarthy for additional comment and approval. After McCarthy made additional edits, a final report was prepared that was virtually identical to the draft with the legend identifying S.A.C.'s role deleted so that the final report reflected only that it was a product of the Camelback Defendants' purportedly independent research.

83.    McCarthy instructed the Camelback Defendants, and they agreed, to hold the report for approximately 3-7 days so that S.A.C. and other members of the Enterprise, known and unknown, could establish short or short-equivalent positions and other trading strategies in anticipation of the report's release. After SAC, the Camelback Defendants, and other Enterprise members had taken their Biovail short or short-equivalent positions, on June 20, 2003, McCarthy

30

instructed Camelback to issue the report -- which assigned Biovail an "F" grade based on false, misleading, and unfounded accounting criticisms.

84.     The putative Camelback report on Biovail was materially false and misleading in numerous respects, including but not limited to the following. First, the report was falsely portrayed as the product of Camelback's unbiased and objective selection process and analysis, when in fact it was generated at the direction of, and written by, S.A.C. for the purpose of driving the price of Biovail stock down. Second, the report was not being released immediately and simultaneously to all of Camelback's subscribers as Camelback represented, but was instead being released only after S.A.C. (and the Camelback Defendants) had taken their short positions.

85.     Finally, the report's purported conclusions lacked any reasonable or factual basis, did not reflect the honestly held opinions of the Camelback Defendants or any research, let alone independent unbiased research, but was instead based on a series of grossly distorted and materially misleading factual assertions and opinions made for the sole purpose of advancing S.A.C.'s market manipulation objective. These materially false, misleading, biased, and unfounded assertions included, but were not limited to, the following:

- The report misrepresented without any reasonable factual basis that Biovail's "strategy to transform the company into a fully-integrated pharmaceutical firm" might be "unraveling" and "running out of steam" because "revenue growth slowed dramatically in 2002 as a result of declining product sales." In fact, revenue growth in 2002 was 35.1% higher than in 2001, product sales actually grew by 24% from 2001, and the company was in the process of launching four major new products as part of the strategic transformation the report falsely claimed was "unraveling."

- As further support for the false assertion that the transformation was "running out of steam," the report misrepresented without any reasonable good faith basis that Biovail's revenue mix was deteriorating without mentioning that the imminent new product launches would materially improve that revenue mix.

- The report misrepresented without any reasonable factual basis that Biovail's

31

research and development ("R&D") commitment was declining when in fact such expenditures had increased from $17.5 million in 1998 to $52 million in 2002 with projections for 2003 between $75 million and $90 million.

⊛ The report misrepresented without any reasonable factual basis that this non-existent decline in R&D expenses would substantially limit Biovail's ability to grow organically by ignoring, among other things, the fact that Biovail had launched Cardizem LA in April, and was scheduled to launch Zovirax Cream in July and Wellbutrin XL in Q3, 2003. In addition, the report opined without any good faith basis or even any explanation that the 72% increase in R&D expenses in the most recent quarter and projected $75 to $80 million in 2003 would be "too little, too late."

⊛ The report misrepresented without any reasonable factual basis that Biovail's R&D expenditures were declining as a percentage of its revenues and that this evidenced a waning commitment to research and a "significant competitive disadvantage." This assertion was materially false and misleading because it included in the ratio revenues derived from acquired products for which R&D costs had been expended prior to the acquisition and could not be recorded as Biovail R&D expenses under Generally Accepted Accounting Principles ("GAAP"). Contrary to the report's false assertion, Biovail's R&D expenses as a percentage of non-acquired product revenue were increasing dramatically as was R&D and amortization as a percentage of all revenue. Both of these ratios, which fairly and accurately depict the relationship between Biovail's R&D and revenues, were omitted from the report.

⊛ That the omission of such ratios was the product of a bad faith effort to distort Biovail's accounting is evidenced by the fact that the report later accuses Biovail of not properly including those same acquired R&D expenses in its earnings analysis, even though GAAP prohibited any such inclusion. The source of this criticism was not an honestly held belief in the assertion but rather a committed bias to skew the analysis in a way necessary to generate a negative result.

⊛ The report misrepresented without any reasonable factual basis that Biovail's R&D expenditures as a percentage of revenue lagged its "peers" and thus put Biovail at a competitive disadvantage. This analysis was materially false and misleading because the purported "peers" used for the comparison were not remotely approximate comparables for Biovail since their business models were fundamentally different. A reasonable peer analysis would have included companies such as Biovail competitor Andrx with whom Biovail's R&D expenditures were completely in line. Moreover, the report's assertion was false, misleading and unfounded because if acquired R&D expenses were included in the metric -- as the report elsewhere did where it had a negative impact -- Biovail would have had one of the highest commitments to R&D as a percentage of revenue.

⊛ The report misrepresented without any reasonable factual basis that product

32

revenues were materially declining, and the report failed to mention the substantial increase in revenue that would accompany the four new products being launched at or about that time. Indeed, to justify this misleading omission, the report claimed one of those new launches had already begun and was faltering when in fact it would not begin for another month.

• The report misrepresented without any reasonable factual basis that Biovail's earnings were not sustainable based on several misrepresentations and unfounded grounds. For example, the report charged that one component of earnings for the last quarter was properly attributed to an unsustainable "active share repurchase program" when no stock had been repurchased in over a year. Similarly, it challenged the sustainability of Biovail's earnings based on the materially false assertion lacking a reasonable basis that Biovail's tax rate was unsustainably low.

• The report misrepresented without any reasonable factual basis that Biovail's financials utilized an inappropriately and unsustainably low tax rate compared to its "peers." This assertion was materially false and misleading because the "peers" bore no reasonable comparison to Biovail's unique tax circumstances or corporate tax structure. In truth, Biovail's tax rate was entirely in line with similarly structured companies and had been maintained for more than a sufficient time to demonstrate its sustainability.

• The report misrepresented without any reasonable factual basis that Biovail had a history of "aggressive accounting" that "materially alter[ed] the firm's reported financial performance by shifting profits to the current period (at the expense of future periods)." The basis for this accusation of aggressive accounting was that in 2001 Biovail restated certain prior quarters, which the report claimed showed that in those prior quarters Biovail had failed "to comply with generally accepted accounting principles" and thereby overstated "top line revenues -- arguably the most important metric followed by analysts and investors." This assertion was materially false and misleading because at the time those prior quarters were reported on they were properly accounted for under GAAP and were subsequently restated only because subsequent changes in the governing accounting rules mandated such adjustments to reconcile historical reporting with the newly imposed rule. (SAB 101).

• The report misrepresented without any reasonable factual basis that Biovail had used its "substantial discretion" in accounting for in-process R&D to manipulate earnings -- and that Biovail had in fact used this method to manipulate earnings -- when, in fact, Biovail had no discretion over these mandatory write-offs under GAAP and the written-off values were set by independent third-party valuation experts.

• The report misrepresented without any reasonable factual basis that Biovail was experiencing "severely negative free cash flow" when in fact Biovail was generating significant positive cash flows. In order to support this gross distortion, the report ignored actual cash flows and instead misleadingly and

33