without any reasonable basis used the cash available after discretionary acquisitions as the only measure of cash flow.

• The report cited its materially misleading cash flow analysis to support an equally misleading and unfounded concern that Biovail would suffer a liquidity crisis. In fact, by any reasonable measure, Biovail had ample liquidity with enormous cash flows, a substantially undrawn $600 million credit facility, and a credit rating just below investment grade.

• The report misrepresented Biovail's debt ratios by citing only debt to equity and not debt to EBITDA or interest coverage both of which are standard credit metrics which showed low leverage.

• The report misrepresented without any reasonable factual basis that Biovail had a "significant risk" of "low quality receivables" when, in fact, Biovail had better quality receivables than almost any other company in the industry with most receivables due from three of the largest and most credit-worthy pharmaceutical companies and three similarly substantial and credit-worthy major wholesalers.

• The report misrepresented without any reasonable factual basis (or explanation) that Biovail had overstated the value of its substantial intangible assets.

• The report misrepresented without any reasonable factual basis that there was a "high likelihood of product . . . write down[s]." This incorrect assertion was based on several material misrepresentations and unfounded assertions of fact. First, citing what it described as a "sharp drop in sales," the report asserted that Biovail's accounting had overstated Cardizem CD's and Zovirax's effective product life. This statement lacked any reasonable factual basis and was materially misleading because the described drop was expected, disclosed, predictable, and fully accounted for in the drugs' acquisition prices and amortization schedules. Second, the report stated falsely that the newly launched Cardizem LA would face "strong competition from other products in the Cardizem family (i.e., CD, SR, and XL)" when, in fact, Biovail owned the rights to CD, SR was not actively being marketed by anyone anywhere, and no such thing as Cardizem "XL" existed. Third, the report predicted Biovail would also have to write down its drug Vaseretic because it had "ceased promoting" it when, in fact, Biovail had never promoted that product and accounted for its product life and projected revenues based on that fact. Fourth, the report stated that Zovirax had generic competition, which it did not.

86.   These and other gross misrepresentations of fact and unfounded statements were the product of -- and could only be reasonably viewed as -- a reckless disregard for the truth consistent with a specific intent to deceive in order to serve S.A.C.'s market manipulation scheme. Further evidencing this reckless indifference and deceptive intent is the fact that the

Camelback Defendants never called Biovail to seek input, comment, or the answers to any of the many grossly distorted facts and opinions contained in the report even though this is a standard industry practice and common sense to ensure fair and accurate analysis. No such comment was sought because the objective of the report was not to present accurate and honest analysis, but to manufacture bogus accounting issues that S.A.C. could use to erode investor confidence even in the face of strong business fundamentals and performance.

87.    S.A.C., the Camelback Defendants, and other Enterprise members, agreed and did aggressively disseminate the Camelback report to major Biovail investors, potential investors, other analysts, including Maris, and other market participants to amplify the negative impact of the report's materially false and misleading assertions.

2.    The Maris Wellbutrin XL Report

88.    While collaborating with the Camelback Defendants, McCarthy was also closely collaborating with Maris. Indeed, alerted by several hedge funds that the Enterprise was launching a short-selling attack on Biovail, Maris contacted the leading financial journalists with whom he had dealt during his work on Elan to begin the process of securing similar coverage of what he understood would be an aggressive campaign to drive Biovail's stock down and possibly the company out of business, and in which he intended to participate by issuing extremely negative reports.

89.    Accordingly, on June 26, 2003, Biovail and Glaxo received a highly-anticipated "approvable" letter from the FDA for Wellbutrin XL which meant that FDA approval of this important drug would likely be secured after a limited number of remaining modest tasks were addressed. As a result, the price of Biovail stock began to rise. Although Banc of America Securities had not yet authorized Maris to begin coverage of Biovail, he nevertheless began his

35

support of the short attack by issuing a research report on Biovail competitor Andrx as a vehicle to comment negatively on this undeniably positive Biovail development. In that report, Maris knowingly and materially overstated the difficulty Biovail would have receiving final approval and asserted the approvable letter would likely result in a delay in the receipt of approval without any reasonable basis for that assertion and without any belief in its truth, and only because he believed it would advance the interests of the hedge funds with whom he was working in concert.

90.     Maris and McCarthy continued collaborating on this issue going forward. For example, on July 22, 2003, McCarthy informed Maris of the material non-public inside information that Glaxo and Biovail had "in hand" a class 1 or class 2 letter from the FDA concerning the Wellbutrin XL approval and that Glaxo Wellcome would likely announce this fact the following day. Maris and McCarthy discussed the potential significance of this information to Biovail's price and passed it along to Banc of America Securities clients and S.A.C. adjusted their trading positions based on it.

### 3.   The July 11, 2003 Bogus Camelback Report

91.    On July 11, 2003, McCarthy directed the Camelback Defendants to issue another report on Biovail discussing the disclosure of a two year-old "forward sale" transaction by a Biovail director and knowingly and falsely asserting without any reasonable basis that Biovail had improperly failed to disclose this transaction earlier. Although this dated transaction was not remotely material to Biovail's current condition, had never before nor at the time required disclosure, and did not remotely approach the relevance of far more current and material developments concerning Biovail, McCarthy and the Camelback Defendants used it as a pretext to repeat their prior negative recommendations on Biovail and raise further unfounded concerns regarding its reputation and practices. Again, McCarthy, the Camelback Defendants, and other Enterprise members agreed and did aggressively disseminate the Camelback reports to major Biovail investors, potential investors, other analysts, including Maris, and other market participants to aggravate the negative impact of those reports.

### 4.   The Attack On Cardizem LA

92.    In addition to disseminating materially false and misleading information concerning Biovail's accounting, the Enterprise also targeted its Cardizem LA launch and strategic transition to a fully-integrated pharmaceutical company. Thus, beginning at or around the same time as the efforts to spread rumors concerning Biovail's accounting, Enterprise members also began spreading negative rumors that the PLACE clinical experience study was an inappropriate means to boost Biovail's financials (when in fact PLACE prescriptions were free).

93.    Like the attack on Biovail's accounting, the effort to sabotage Cardizem LA initially manifested itself in general marketplace rumors. This whispering campaign however reached an apex on or about July 20-21, 2003 when The Wall Street Journal and Barron's

published reports raising the identical (albeit unfounded) assertion that the PLACE clinical experience research study was nothing more than a method of paying doctors to write prescriptions. The Wall Street Journal article was entitled "Biovail Is Paying Doctors Prescribing New Heart Drug," and the Barron's article was entitled "Pill Pusher: Drug Maker Biovail Sparks Controversy By Paying Doctors to Write Prescriptions." In addition, the articles referred to the purported concerns about Biovail's accounting that the Enterprise had previously manufactured and disseminated throughout the market.

94.     That these negative articles were orchestrated is apparent from the fact that the two articles were written by two different writers, told essentially the same story, quoted overlapping sources, and appeared virtually simultaneously. Moreover, it is apparent that Enterprise members and other hedge funds were involved in this orchestration. The articles echoed the purported accounting concerns contained in the ghost-written Camelback reports and every doctor quoted critically about the PLACE program was connected to hedge funds either directly or through Defendant Gerson Lehrman.

95.     For example, the most critical comments came from a 79 year-old New York cardiologist Emanuel Goldberg, who was inexplicably quoted in each purportedly independently researched article. In The Wall Street Journal, Goldberg was quoted as saying that Biovail told him "'If you give [Cardizem LA] to 15 patients, you'll get $1,000'" but he refused because "'it's not clear why you're really giving the drug.'" In the Barron's article, Goldberg also claimed he had been offered $1,000 to write 15 prescriptions, and said "I told them that it was unethical" but "they still asked me if I'd do it." Moreover, although he said he had not actually even considered the program let alone agreed to participate in it, he nevertheless reported that he doubted the "seriousness of the research component in Biovail's program."

38

96. Goldberg's story was categorically false. Biovail never asked Goldberg to participate in the PLACE program let alone proposed paying him $1,000 to write prescriptions. Indeed, Goldberg has since admitted that he was not, in fact, contacted by Biovail, and that Gerson Lehrman paid him to provide quotes for The Wall Street Journal and Barron's.

97. Goldberg's fabricated story was orchestrated by the Gerson Lehrman Defendants, for whom Goldberg worked regularly, on behalf of members of the Enterprise paying Gerson Lehrman to assist in generating negative publicity about Cardizem LA. Indeed, of the five doctors to whom negative comments were attributed in these articles, at least four were consultants with Gerson Lehrman or otherwise did work for hedge funds. For example, hedge fund Perry Capital was "consulting" with North Carolina cardiologist Joseph Guzzo through Gerson Lehrman just days before he was quoted negatively in the Wall Street Journal article. At the same time, Perry Capital was accumulating no less than 1.1 million put options on Biovail with which it stood to gain enormous profits in the event Biovail's stock price declined. Likewise, Gerson Lehrman consultant Dr. Peter Goodfield was quoted negatively in the Barron's article, and the most critical doctor after Goldberg -- Cleveland cardiologist Dr. Eric Topol -- was directly employed as an advisor by hedge fund Great Point Partners which was also directly or indirectly trading in Biovail at the time and would later gain notoriety for making tens of millions of dollars shorting Merck stock based on Dr. Topol's recommendations concerning Vioxx.

98. As a direct result of the approximately first six weeks of the short-selling attack (from early June through the publication of the orchestrated articles concerning Cardizem LA), the materially misleading unfounded negative rumors, reports, and news articles eroded the price of Biovail's stock by 20%. In addition, within weeks of the Barron's and Wall Street Journal

39

articles, the United States Attorney's Office for the District of Massachusetts, on behalf of the Office of Inspector General, commenced an investigation into the PLACE program that would ultimately have a further substantial negative impact on investor and marketplace confidence and ultimately -- as set forth more fully herein -- Biovail's effort to successfully launch Cardizem LA and become a fully integrated pharmaceutical company.

5.   **The Bogus July 31, 2003 Camelback Report**

99.   In or about July 2003, McCarthy informed the Camelback Defendants that while S.A.C. was pleased with the over 20% decline in Biovail's stock price since early June and had made enormous profits based on that decline, S.A.C. was looking to drive the stock price far lower still. Consistent with this objective, on July 31, 2003, McCarthy again had Camelback issue a report McCarthy dictated that was rife with materially false and misleading information, including the following:

- The report reiterated the unsubstantiated and materially misleading assertion that "the firm's strategy of developing into a 'full-service pharmaceutical company' has failed to produce tangible benefits to shareholders" when in fact the implementation of that strategy was just beginning.

- The report misrepresented without any reasonable factual basis that "management has obscured" the extent of this non-existent failure by "aggressive accounting tactics."

- The report misrepresented without any reasonable factual basis that Biovail's reported earnings per share were "vastly overstated" and "artificially inflate[d]" by improperly excluding various items such as acquired in-process research and development costs, when in fact GAAP required that such charges be separately identified and written off.

- The report misrepresented without any reasonable factual basis that Biovail would not be able to sustain its rate of earnings based on several materially misleading rationales and misrepresentations. For example, the report falsely asserted that declining product sales were indicative of a failure in Biovail's new product launches when in fact such declines were (and had been disclosed as) the temporary and expected dislocation associated with the transition from older legacy products to the new products then being set for launch.

40

- The report misrepresented without any reasonable factual basis that Biovail was "significantly more leveraged" than in previous quarters.

- The report rebroadcast the unfounded and false reports that Biovail was pursuing a program "to pay doctors for prescribing Cardizem LA."

- The report reiterated the previous false and unfounded predictions of "imminent risk of a product rights write-down, and frequently negative free cash flow."

100.   Again the false and unreasonable unfounded assertions were not honestly held beliefs or analyses of the Camelback Defendants but were offered instead to advocate the views and interests of the hedge funds paying for the report. This bias and indifference to the truth is evidenced in the fact that the Camelback Defendants did not contact the company to seek information or clarification concerning any of the issues to be discussed or concerns raised in this materially misleading report. Again also, S.A.C., the Camelback Defendants, and other Enterprise members agreed and did aggressively disseminate the Camelback reports to major Biovail investors, potential investors, other analysts, including Maris, and other market participants to aggravate the negative impact of those reports.

6.     The Bogus September 16, 2003 Camelback Report

101.   During September, McCarthy continued to work with the Camelback Defendants to orchestrate an additional negative research report on Biovail. On or about September 16, 2003, Camelback issued an Earnings Quality Analytics Alert that reiterated -- without any new information -- its materially false and misleading assertions about Biovail's increased dependence on lower quality sources of revenue, negative cash flows, low sustainable earnings, earnings overstated by nonrecurring gains, unsustainably low tax rates, inappropriate off-balance sheet R&D entities, in-process R&D charges, and declining core product sales. In addition, the Camelback report added the following materially false and misleading statements:

41

- The report misrepresented without any reasonable factual basis that Biovail had established a new entity to inappropriately shift research and development costs off balance sheet when, in fact, this entity was not an off-balance sheet entity but was a consolidated entity.

- The report misrepresented without any reasonable factual basis that an increase in Biovail's receivables balance in 2002 reflected deteriorating payments and past earnings manipulation when in fact the increase merely reflected sizable co-promotion payments and thus reflected not a decrease in payments or manipulation, but a substantial increase in amounts earned, due, and substantially collected.

- The report misrepresented without any reasonable factual basis that expanding inventory levels reflected a "risk of obsolete inventories" when in fact it reflected the build-up of inventory for Biovail's new product launches.

- The report misrepresented without any reasonable factual basis that Biovail had "fragile free cash flows" when in fact Biovail's cash flows were far greater than those of its closest competitors. Camelback made the materially misleading and provocative assertion that "free cash flow declined over 200%, as acquisitions jumped an alarming 2144%" when in fact the only reason such numbers were so high was because in the prior year the report used for comparison Biovail had elected to make no acquisitions and therefore did not consume any of its cash flow for acquisitions.

- The report misrepresented without any reasonable factual basis that Biovail's acquisitions were "alarming" or unsound.

- The report falsely asserted without any reasonable or factual basis that the increased intangible asset base indicated that "the company has overpaid for recently acquired subsidiaries and product rights" resulting in "both assets and book value [being] overstated." In fact the intangibles value had increased because Biovail had used its cash flow to acquire more revenue generating assets, while Camelback offered, and had, no reasonable basis for concluding any such acquisitions were overvalued.

102.    As before, this report did not contain or reflect an unbiased independent opinion but a result oriented service to the Camelback hedge fund clients. Highlighting this bias, the Camelback Defendants again did not contact Biovail to review their analysis, held the report once it had been completed until S.A.C. instructed them to release the report, and, in agreement with S.A.C. and other Enterprise members, aggressively disseminated the report, including to Maris, to magnify its negative impact.

42

### 7.    The Maris October 8 and 10, 2003 Reports

103.    McCarthy's collaboration with Maris intensified as Maris prepared to finally initiate coverage on Biovail when it reported its third quarter results. At the time, Maris informed McCarthy and other Enterprise members that he intended to initiate coverage with an extremely negative report and a sell rating based on the same or very similarly unfounded accounting criticisms McCarthy had written in S.A.C.'s bogus Camelback reports as a reason for recommending a sell in the face of Biovail's substantial business prospects. McCarthy and Maris understood that such criticisms from Maris would reach a far broader audience and have a far greater impact on Biovail and its stock price than the prior rumor campaign and ghost-written Camelback reports previously disseminated.

104.    To accomplish this preordained objective, Maris initially retained two outside accounting experts he hoped would parrot the accounting criticism previously manufactured in S.A.C.'s Camelback reports and provide him a basis for recommending that investors sell their Biovail stock despite otherwise solid business projections that Maris could not dispute. This plan, however, hit a snag when the first two retained experts submitted reports that were not consistent with this preordained objective. Indeed, the first expert informed Maris that the requested accounting analysis was "meaningless" for Maris's stated purpose of evaluating Biovail's investment value because it did not address the value of Biovail's products, intangible assets, and business model. The first expert further stated that the analysis required to answer the question concerning Biovail's investment value was whether Biovail management could succeed in executing its business model, and that the conclusion of that analysis "might very well be yes " but could not be determined from Maris's requested analysis. While the second expert rendered no opinion on the meaningfulness of the request, his characterization nevertheless also torpedoed

43

Maris's preordained objective by grading Biovail's accounting as a B- and noting that while some of the accounting was "moderately aggressive," the enormous detail Biovail provided in its public disclosures permitted any competent analyst to easily adjust for any such aggressiveness. Moreover, even with respect to the criticisms they did offer, the experts were not consistent.

105.   Realizing that the reports were insufficient to sustain his intended conclusion and, in fact, directly contradicted that conclusion, Maris and his staff undertook to salvage their efforts by talking those experts into offering additional comments supporting Maris's opinion. The second expert, however, actually modified his conclusions during that process to up his grade of Biovail's accounting to a B+.

106.   An objective analyst would have accepted these conclusions, and abandoned his thesis that the share value that Biovail's business would otherwise justify should be discounted due to accounting concerns. Maris, however, was not objective, but committed to a negative report citing accounting concerns that he knew would harm Biovail's business and substantially depress its stock price to the extreme benefit of his short-selling hedge fund supporters and detriment to Biovail's legitimate investors and Banc of America Securities' less privileged customers.

107.   Accordingly, Maris scrambled to locate a third putative expert to provide some basis for asserting that accounting issues could justify discounting what would otherwise be a valuation requiring a buy rating. Although this third expert's report made clear -- as did his predecessors -- that his analysis was not an effort to, and should not be used to, opine about Biovail's investment value, and only offered modest accounting criticism, under pressure from Maris and his staff he also offered that the accounting left "an impression that the opaqueness in its financial reporting is perhaps a reflection of a deeper problem associated with the execution

44

of its business model." Leaping at this "impression" of "perhaps" an associated problem with the business as a slim read upon which to base their completely result-oriented objective, Maris assistant David Lohman reported to Maris that "our man came through for us."

108.    Nevertheless, Maris realized that he could not -- as originally planned -- include the entirety of the experts' reports, conclusions, or grades in his own report because doing so would reveal they did not support his desired outcome. Accordingly, Maris decided that he would "summarize" the reports in a manner that would support his position.

109.    Maris's plan to use the misrepresented accounting criticisms to initiate negative coverage at or around the time Biovail announced its third quarter results in late October was overtaken by Biovail's announcement in early October that it would miss earnings guidance for the quarter due to a number of factors, including an accident involving a truck carrying one of the initial shipments of recently approved Wellbutrin XL. Although at the time of the accident, Biovail had requested that trading in its stock be halted until it could determine exactly what happened, the New York and Toronto stock exchanges nevertheless instructed Biovail to issue an immediate press release so that trading could begin without delay. In that announcement, Biovail stressed -- and objective analysts and rating agencies correctly agreed -- that the quarter "miss" was not the product of a fundamental change in the company's outlook or business. Nevertheless, fed by the substantial uncertainty that the Enterprise's misinformation campaign had generated about Biovail up to that point and additional manipulative efforts, the market reacted far more negatively than it would otherwise have to the announcement resulting in a substantial drop in the stock price.

110.    The badly exaggerated drop in Biovail's stock price caused by the Enterprise's misinformation campaign resulted in additional enormous profit for the short-selling S.A.C.

Defendants, Camelback Defendants, and other Enterprise members. On October 6, 2003, McCarthy reported S.A.C.'s success to Maris who responded "I hope you will make them even more money." Maris also informed McCarthy and other Enterprise members that he was preparing to rush his planned negative report out to capitalize on Biovail's negative news and intended to issue it on October 8, 2003.

111.   As promised and always intended, on October 8, 2003, Maris initiated coverage on Biovail with a report containing numerous glaring errors concerning basic company information that reflected his indifference to the facts relating to Biovail's business. The report, as well as a more detailed follow-up report issued on October 10, 2003, was materially false and misleading in numerous respects.

112.   First, the reports led with a materially false and misleading description of the purported findings by the three accounting experts, which the October 8, 2003 report made clear were the central basis for Maris's conclusion that Biovail's stock value should be substantially discounted compared to its peers and thus be valued as a sell. Maris did not include the experts' actual written reports, their letter grades, or their complete findings and conclusions. Maris avoided such full disclosures because they would have gutted his plan to cite these accounts as a reason to sell Biovail stock.

113.   Moreover, Maris's alternative purported "summary" grossly distorted the actual opinions given to Maris because it included only the criticisms, badly exaggerated those criticisms, and omitted all explanatory, mitigating, or exculpatory information or characterizations, including most importantly the experts' ultimate conclusions and grades which were not consistent with Maris's depiction. By way of example, the Maris summary contained

the following material misrepresentations and omissions concerning the conclusions he had

received:

- It did not disclose that the summary was not, as it represented, the product of objective unbiased analysis but was instead the product of a preordained objective to serve the interests of those hedge funds with which Maris was in concert.

- It did not disclose that the third expert was retained only after the first two did not provide the necessary answers and it misrepresented that Maris accepted the first three experts who agreed to participate.

- It did not disclose that the first accountant had (a) concluded that the grade and analysis was "meaningless" for Maris's stated purpose; (b) opined that the material investment issue was not accounting technicalities but "whether the $1.25 billion of purchased goodwill, intangibles and intercompany instruments . . . [could] be managed so as to create a future profit stream commensurate with the cost of capital;" and (c) concluded that "the answer very well may be yes" to that material question but could not be determined through Maris's requested accounting analysis.

- It failed to disclose that the second expert initially graded Biovail's accounting as a B- and then as a B+ and further opined that while some of Biovail's accounting was "moderately aggressive" in places, Biovail provided so much detail in its public disclosures that any analysts could "perform analytical adjustments and fine tune these aggressive methods."

- It failed to disclose that the third expert had likewise stated that his analysis was not appropriate for Maris's stated purpose.

- It carefully edited out innumerable inflammatory and argumentative points that revealed that the most critical expert lacked credibility and professionalism.

- It used the summary format to portray a consensus among the experts when in fact their opinions varied widely and were so inconsistent as to preclude any reasonable summary of one set of conclusions.

114.    Second, Maris's October 10, 2003 report also included his own equally distorted

analysis that included, among others, the following materially false and misleading and not

reasonably based characterizations:

- It misrepresented and materially exaggerated a purported decline in Biovail organic sales by, among other things, excluding from the analysis substantial organically-developed product sales and inexplicably included non-organic sales.

47

In addition, Maris's assertion that Biovail could not sustain its organic growth rate was inconsistent with his internal financial model which projected growth from $646 million in 2002 to in excess of $1 billion in 2003.

- It misrepresented without any factual basis that Biovail's R&D expenditures were declining even though Maris's internal financial models show that such expenditures actually increased to $52.2 million in Q2 from $51.5 million in Q1 and to $42.5 million over the prior six month period from $39 million over the same period the prior year, and that in the most recent quarter R&D had been the highest ever quarterly expense. Moreover, Maris's internal financial model contradicted his assertions by showing $81 million in R&D expenses in Q3 2003 versus $52.2 million in Q3 2002 with a further increase to more than $100 million in 2005.

- It misrepresented without any factual basis that that Biovail's cash flow was negative when, in fact, before discretionary acquisitions cash flow was $772.7 million over the prior four years and $174.2 million in the prior six months.

- It misrepresented without any factual basis that future cash flows would require additional acquisitions. Indeed, Maris's internal financial model reflected that even without acquisitions Biovail would generate $200 million in EBIT and cash before depreciation in the next six months and over $1 billion by December 31, 2005, and experience earnings growth from 1.78% in 2002 to in excess of 10% in 2003 and 2004.

- It misrepresented without any factual basis that Biovail's key performance metrics significantly lagged those of its peers based on an accounting analysis Maris used that was inconsistent with GAAP.

- It raised materially false and misleading and not reasonably founded concerns about Biovail's credit based solely on Biovail's debt to equity ratio to the exclusion of various other metrics universally considered more instructive on this issue and heavily favoring Biovail, including Biovail's debt to EBITDA, interest coverage, and EBITDA to interest ratios.

- It manipulated the analysis to secure negative results by, among other things, inconsistently including or excluding acquired in process R&D expenses in his financial analysis so as to reach the most negative outcome.

- It misrepresented without any reasonable factual basis that Biovail's low tax rate was not sustainable because it was unusually low compared to purported peer companies. In fact, none of the purported peer companies were remotely comparable to Biovail in their tax circumstances, history, or structure. Moreover, this assertion was materially false and misleading because it failed to even mention that Maris's internal financial model showed Biovail had sustained that tax rate for over three years, publicly available information showed Biovail had

sustained that rate since 1994, and other detailed company disclosures showed
that Biovail's business had been carefully structured so as to sustain that tax rate.

115.    Third, the report misrepresented that it was the product of Maris's objective,
unbiased, and independent analysis when in fact it was created to support the trading positions of
substantial short-selling hedge fund clients who Maris sought to please and work with so as to
advance his own personal, professional, and financial interest at the expense of Biovail and its
investors and employees as well as the other clients at Banc of America Securities who did not
enjoy the same special access and influence as those hedge funds. Nor did the report disclose
that Maris was in many instances basically doing little more than rebroadcasting the almost
identical and similarly tortured analyses that McCarthy had included in the ghostwritten
Camelback reports that the Enterprise members had provided to Maris -- as reflected in the
following representative but not exhaustive comparison between Maris's reports and S.A.C.'s
Camelback analysis:

| S.A.C.'s Camelback Reports | Maris Reports |
|---|---|
| Describes analysis as "Earnings Quality Analytics" | Describes analysis as "Earnings Quality Analysis" |
| Claims "Recent revenue growth" has "slowed dramatically" | Claims "Recent revenue trends" have "significantly slowed" |
| Claims "Significant decline in the quality of bottom line earnings" over a five year "cumulative" basis | Claims that "Biovail's earnings quality has been poor" over a five year "aggregate" basis. |
| Questions "limited organic growth" | Questions whether "company has produced organic growth" |
| Criticizes decline in "product sales as a % of total revenue" and "increases in non-core revenues" | Criticizes decline in "Product sales as a % of total sales" and increase in "significant royalties and licensing revenue gains" |

49

| S.A.C.'s Camelback Reports | Maris Reports |
|---|---|
| Criticizes that "R&D expense has remained flat over the past three years and fallen to 6.6% of the top line revenues in 2002." | Criticizes that "R&D expense as a percentage of revenue was just 6.6% of total revenue in 2002." |
| Criticizes the "large intangible asset balance" and ratio of "intangible assets relative to total assets" | Criticizes "the amount of intangible assets on Balance Sheet" and "intangible assets [ ] as a percent of total assets" |
| Questions Biovail's "unusually low" tax rate "not sustainable" because it is "significantly lower than those reported by all but one of its peers" | Questions "Is the unusually low 7% tax rate sustainable?" because it was "significantly below its peer group" |
| Criticizes "history of unusual transactions and aggressive accounting" | Criticizes "history of employing aggressive accounting practices" |
| Asserts "Large In-Process Research and Development Charges Distort Earnings" and<br><br>"Frequent In-Process Research and Development Charges Skew profitability" | Asserts "In process R&D – why it should be included as R&D" |
| Claiming aggressive accounting, asserts that "On December 29, 2000, BVF purchased all the [ ] common shares of IPL . . . Total consideration for the transaction amounted to 204.9 million." | Claiming aggressive accounting, asserts that "On December 29, 2000, Biovail purchased all of the equity of Intelligent Polymers Limited . . . for total consideration of 204.9 million." |
| Claiming aggressive accounting, asserts that "On September 29, 2000 two days before the first scheduled price increase – BVF sold its interest in the company to IPL Acquireco." | Claiming aggressive accounting, states that "On September 29, 2000, just two days prior to the first price hike, Biovail sold its stake in IPL to IPL Acquireco." |
| Claiming aggressive accounting, states that "Three months later, on December 29, 2000 BVF purchased all the voting common shares of IPL Acquireco." | Claiming aggressive accounting, states that "On December 29, 2000, less than three months later, Biovail purchased all common shares of IPL Acquireco." |

| S.A.C.'s Camelback Reports | Maris Reports |
|---|---|
| Claiming aggressive accounting, states that "the product rights were immediately expensed as IPRD – which was essentially ignored by the analyst community" | Claiming aggressive accounting, states that expensing of IPL-Acquireco R&D was "dismissed as non-recurring by the analyst community" |
| Claiming aggressive accounting, states that that "BVF paid $43.1 million to Pharma Tech to terminate the development of certain products, recording the payment as an in-process research and development charge" | Claiming aggressive accounting, states that "BVF also incurred a non-cash charge for acquired research and development of $43.1 million related to a termination of a development agreement that BVF previously had with Pharma Tech." |
| Warns "Although free cash flow rebounded in Q1 2003, we do not believe this trend is sustainable. In this regard, in order to continue to produce the level of sales growth to which BVF investors have become accustomed, the comparatively low level of Q1 product rights acquisitions cannot last." | Warns "While FCF trends in 2003 show an improvement, this is too short a data set to judge any true progress or trend in our opinion. We believe that in order to continue to generate the robust earnings growth BVF investors are accustomed to, the product company will likely have to make additional product acquisitions." |
| Criticizes questionable "company loans to officers" and the purchase of an airplane "from an entity controlled by Melnyk" | Criticizes "company loans to management and the purchase of a corporate jet from CEO." |

116.   As set forth more fully above, these accounting and other criticisms were materially false and misleading, were not reasonably based, and were not honestly-held beliefs based on objective analysis but were result-oriented advocacy offered to appease certain hedge fund clients of the bank for Maris's own personal, professional, and financial benefit. That Maris's accounting focus was not the product of good faith is further evidenced by Maris's failure to raise like concerns with other similarly-situated companies or ever again revisit these issues in a similar manner in any future Biovail report.

117.   Finally, Maris's report misrepresented that he had conducted a personal investigation into the truck accident that had precipitated Biovail's early October earnings warning, and makes the absolutely unfounded accusation that the truck was "empty." More significant, Maris misrepresented that he had investigated the accident without disclosing that he was simply rebroadcasting without attribution assertions made to him by short-selling Enterprise member Itros Capital which he understood was, like S.A.C., shorting Biovail stock and provided Maris with the negative information concerning the truck accident so that he would "rebroadcast" it to the market. At the time, Itros Capital was likewise collaborating with S.A.C. concerning the same issues and the Itros Capital fund manager involved would later go on to work for the S.A.C. Healthco managers and defendants Arthur Cohen and Joseph Healey.

118.   Maris's premeditated and biased reports not only made a mockery of any pretense of independent analysis, but his manufactured reports -- intended to assist specific short-selling clients in their trading strategies -- directly violated the representations made in those Banc of America Securities reports, which promised: "Any opinions, projections or forecasts in this report are, unless otherwise stated, those of the author and do not represent the views of the issuer or any other person. . . . This report is issued without regard to the specific investment objectives, financial situation or particular needs of any specific recipient."

119.   Maris's October 8 and 10, 2003 reports received substantial attention in the press and financial markets due in large part to Maris's and McCarthy's aggressive promotion. Indeed, McCarthy praised Maris for the report in an October 9, 2003 e-mail and reported that he was using the report to pressure other analysts to likewise downgrade Biovail. Maris worked aggressively to get other market participants to publicize, rebroadcast, and adopt the materially false and misleading accusations in his report and obsessively monitored the report's minute-by-

minute impact on Biovail's stock price and the substantial media and investor attention he was generating. In addition, Maris collaborated with McCarthy, Arthur Cohen, Healey, and other Enterprise members on his plans to release an extended version of the October 8, 2003 report two days later for the purpose of maintaining the downward pressure on the stock around this time. Maris also informed others that he "would like to contact the FBI, SEC, and local authorities" to discuss his criticisms of Biovail's accounting in the hope that doing so would result in the initiation of regulatory investigations and even further downward pressure on Biovail's stock.

120.    Immediately upon the release of these two putative research reports, Maris had his staff send a constant stream of reports on the stock price movement and whether it was going down as he plainly hoped.

8.    The Bogus October 7, 2003 Camelback Report

121.    The day before Maris issued his initial misleading report, McCarthy also had Camelback issue a new report falsely accusing Biovail of "reversing Prilosec royalties reported in an earlier period." This report was categorically false because Biovail had never booked or reported any such royalties in any prior quarter or, therefore, reversed any prior reported royalties.

122.    The market reaction to early-October 2003 Maris and Camelback reports was an unmistakable 14% additional drop in the stock price, on enormous trading volumes.

53

9.    Maris's October 30, 2003 Ambush

123.    Prior to Biovail's October 30, 2003 Q3 earnings call, Maris was informed of misappropriated confidential non-public information that Melnyk had used his securities account at UBS in some form of financing arrangement. Armed with that information, on the company's October 30, 2003 investor conference call concerning its third-quarter earnings, Maris asked Melnyk whether he had "sold any stock or entered into any agreement such as loans where the stock is pledged like collars or derivative structures." Melnyk correctly answered no. Maris's question was irrelevant to Biovail's third quarter performance that was the subject of the call, and was intended solely to falsely suggest that Melnyk was surreptitiously monetizing his Biovail holdings without disclosure.

124.    That same day, McCarthy congratulated Maris on his role in turning investor sentiment against Biovail. In an e-mail, he notified Maris that because of their efforts "the chat room has turned" with posters citing Maris's accounting attacks -- which McCarthy and other members of the Enterprise were aggressively rebroadcasting -- as the reason not to invest in Biovail because "it is impossible to give a valuation floor for bvf as we have no clues what [Biovail's accounting] is hiding." The next day, Enterprise members Maris and Vickrey criticized Biovail's accounting and investment value in the Ottawa Citizen newspaper. That same day, hedge fund Balyasny Asset Management, which was also shorting the stock, wrote Maris "thanks for your help again," and provided Maris with a detailed negative analysis of Biovail's accounting for Maris's future use and rebroadcast. As he had hoped, numerous short-selling hedge fund clients congratulated Maris and his bosses on the impact of report.

10.    The Bogus October 30, 2003 Camelback Report

125.    The same day as Maris's questions about collars and derivatives, McCarthy and the Camelback Defendants issued an October 30, 2003 report that falsely cited the large amount of Wellbutrin XL shipped out at the end of the quarter as evidence "of channel stuffing." In fact, however, as McCarthy and the Camelback Defendants well understood, the demand for Biovail's Wellbutrin XL product was enormous and far exceeded Biovail's supply such that any suggestion of "channel stuffing" was beyond specious.

126.    Likewise, the Camelback report again falsely accused Biovail of creating an off-balance sheet vehicle to hide R&D costs when in fact the vehicle they were discussing was being consolidated on Biovail's books. Finally, Camelback alleged "aggressive accounting" against Biovail despite the fact that Ernst & Young had approved its financial statements for both years and without regard to numerous instances in which Biovail elected conservative accounting positions than was necessary. The Camelback report was immediately forwarded to Maris.

127.    At or around the end of October, McCarthy arranged for a meeting between the Camelback Defendants and Steven Cohen's right-hand man Matt Grossman and other senior S.A.C. officials about expanding Camelback's work for S.A.C. based on the successful work on Biovail and other "hatchet jobs." During that meeting, the S.A.C. representative made it clear that the senior levels of S.A.C. management were aware of, and pleased with, the work Camelback had done for S.A.C. on Biovail and other hatchet jobs and were interested in using the Camelback Defendants to issue similar reports on other companies going forward.

11.    Enterprise Pressure on Analysts

128.    Despite Maris's effective attack, many uncorrupted analysts correctly declared that the third quarter miss was not indicative of any fundamental problems with Biovail's

55

business or potential. One such analyst worked for J.P. Morgan. During a conference call with investors, a person representing that he was a class action plaintiff's attorney asked the analyst to comment on his potential legal liability to investors based on the price drop that had already occurred and might occur in the future in the face of his positive recommendations. Like McCarthy's promotion of the Camelback and Maris reports, such conduct was obviously intended to intimidate the analyst into downgrading his recommendation to the benefit of short sellers or class action lawyers, or both.

### 12. Maris Falsely Accuses Melnyk of Lying

129. At the same time, questions, rumors, and uncertainty generated by Maris's question to Melnyk about collars and derivatives became so severe that Melnyk elected to voluntarily disclose that while he had not entered into any collar, derivative, or any other instrument to effectively insulate him from risk with respect to the price of Biovail stock, he had taken a loan from UBS that was secured by his UBS securities account, including his Biovail stock. Although this disclosure put to rest any of the concerns that Melnyk was indirectly reducing his financial stake in Biovail, Maris nevertheless used it as an opportunity to launch yet another attack. Ignoring the obvious fact that the disclosed loan was fundamentally different from the collar and derivative transactions Maris had asked about, on November 10, 2003, Maris issued a "research comment" falsely asserting that Melnyk had essentially lied in his response to Maris's questions. By the end of November, Biovail's stock price sunk to a five-year low. Melnyk ultimately sold $49 million worth of stock to pay back the loan. Maris promptly issued a report citing the insider stock sale as a cause for concern.

13.   The SEC Investigation

130.   In addition to aggressively promoting his negative coverage of Biovail and preparing additional negative coverage in collaboration with S.A.C. and other short-selling hedge funds, the Enterprise pursued Maris's stated plan of contacting regulatory authorities by directly or indirectly communicating to them the accounting issues raised in Maris's October 8 and 10, 2003 reports. In doing so, they did not, however, inform the regulators that Maris had badly distorted the accounting analysis of his purported experts, plagiarized S.A.C.'s Camelback reports, rebroadcast information he had received about the truck accident from a hedge fund also shorting Biovail stock, or collaborated closely with S.A.C. and other Enterprise members and permitted them substantive input into his reports and knowledge about the timing of the release of those reports.

131.   The SEC subsequently opened an informal investigation into Biovail and requested that Maris send them a copy of his report. Very shortly after receiving this request, Jesse Eisinger of The Wall Street Journal, alerted by someone that the investigation had been announced and Maris had received a request for his report, called Biovail for comment so quickly Biovail had not even been notified by the SEC that it intended to investigate Biovail. The next day, Eisinger reported that the investigation had been prompted by Maris's report, of which the SEC had asked for a copy. Other media outlets likewise reported that the investigation had been prompted by criticism of Biovail's accounting from "analysts and professors."

132.   On November 21, 2003, Maris issued a research note on the investigation and falsely accused Biovail of failing to disclose the investigation until The Wall Street Journal forced them to disclose it. Other analysts would not issue notes or comments about the investigation until the following days, including Camelback, which at McCarthy's direction

57

issued a report echoing Maris's comments on the investigations and Melnyk's responses to his questions concerning collars and derivatives.

133. The news and Enterprise reports on the investigation caused Biovail's stock value to decline another 21% and even analysts supportive of Biovail reported that Biovail was "dead money" until the SEC investigation was completed.

14. **Other Evidence of Maris's Bias**

134. Maris's anti-Biovail agenda continued to manifest itself in numerous other ways as well. For example, Maris repeatedly ignored Banc of America Securities' own guidelines requiring an upgrade of a sell rating after a stock had fallen within certain ranges of the sell recommendation's target price. In addition, when forced by Banc of America Securities to comply with these requirements, Maris would elect to arbitrarily and without any good faith basis to lower the target price to maintain a sell rating. Thus, for example on December 10, 2003, Maris's assistant David Lohman informed his team that Maris would want to reduce the Biovail target price on his next report, not based on any changed or updated valuation analysis, but solely because a lower target price would be necessary under Banc of America's guidelines to maintain the sell rating to which Maris was committed. Thus, Maris's reports plainly and materially misrepresented that his sell rating was based on whether his objective analysis suggested a target price below the current share price when, in fact, it was the desire to make a sell recommendation that drove Maris's target price.

135. Maris's comments during this period likewise revealed the strong personal agenda in his work. For example, when McCarthy forwarded to Maris an article complimentary of Melnyk, Maris responded that he was "now over the bowl." And, far worse, when McCarthy

forwarded an article whose sole subject was Melnyk's wife and daughters, Maris responded "this makes me want to vomit."

### 15. The Continuing Enterprise Activity

136. In mid-January, Biovail stock began to recover, precipitating increased frenzied communications between Maris, S.A.C., and the other Enterprise members, who then collaborated on getting Rocker Partners' media outlet TheStreet.com to issue an article again questioning the circumstances surrounding the October 3, 2003 truck accident. On January 14, 2004, Maris e-mailed an article entitled "More Questions than answers from Biovail" from TheStreet.com to S.A.C. manager Jon Weiner. The next day, McCarthy and a member of Maris's staff collaborated about the article and how it might be used, and Weiner e-mailed "call me, I know why it [Biovail] is up." Despite these efforts, on January 19, 2004, a panicked McCarthy e-mailed Maris to report that he was "getting run over" by the still-recovering Biovail stock price, and to request a call between Maris, McCarthy, Healey, and Cohen. During that call, Maris assured S.A.C. -- as he did other Enterprise members and legitimate investors -- that he was preparing additional negative research and intended to do so until Biovail stock declined substantially. The rise in Biovail stock stalled the same day as that conversation, as Maris had predicted, and traded down to below the levels at which it was priced before the run-up. On January 20, 2004, McCarthy wrote Maris to thank him: "[Y]ou don't know how much that helped. [T]hanks! Ahhhhhh. Good things."

137. Under the unrelenting pressure of the Enterprise, including the completely biased and result-oriented negative reports Maris issued at every opportunity to further the Enterprise's and his personal objectives, by March 2004, Biovail stock had declined over 58% to below $20 from over $50 less than a year earlier. Pleased with the enormous gains S.A.C. had made on this

drastic decline, the S.A.C. Defendants, including Steven Cohen, called Bettis, Vickrey, and others at Camelback to congratulate them for their good work and express S.A.C.'s desire for more negative reports on companies S.A.C. was shorting. Likewise, numerous hedge funds shorting Biovail praised Maris's efforts.

138.   Although the price of Biovail stock had declined substantially, S.A.C., the Camelback Defendants, Maris, and other Enterprise members would continue to launch attacks to further depress the price and generate volatility in which to execute short-term trading strategies. For example, on March 4, 2004, more than 700,000 shares of Biovail stock were shorted. The next day, Maris issued another negative report on Biovail and Moody's downgraded Biovail's debt rating based on what the Moody's analyst would later describe as a never before experienced flood of phone calls pressuring him for a downgrade.

139.   Likewise, on March 9, 2004, millions of shares were being offered for sale short and there were many extremely short term put options purchased in the obvious expectation that Biovail stock was about to experience immediate downward pressure. That same day Maris released a report warning of previously-unexpected generic competition from unnamed competitors, and two days later the Canadian press issued a story rehashing Maris's prior year's criticisms of Biovail.

140.   The Enterprise's scheme continues to the present day with respect to Biovail and other targeted companies.

## D.   Damages

141.   The Enterprise's scheme inflicted enormous damage on Biovail's reputation, business, employees, and investors. The scheme's unrelenting campaign of negative misinformation devastated the market reputation of Biovail and its products and the business

60

relationships critical to its operation and strategic plans. For example, the attack on Cardizem LA and the misinformation disseminated about Biovail's accounting and business practices devastated Biovail's reputation among, and relationship with, the physicians, patients, and business partners critical to the success of Cardizem LA and Biovail's strategic transition to a fully-integrated pharmaceutical company. Cardizem LA prescription rates slowed and never reached the levels they would have but for the scheme's attack.

142.    Moreover, a critical partner in Biovail's Cardizem LA business, Reliant Pharmaceuticals, Inc. ("Reliant") of Liberty Corner, New Jersey, informed Biovail that it did not want to continue the relationship. Biovail would subsequently learn that this withdrawal was because the Enterprise's misinformation campaign had directly caused reliant to withdraw. The loss of the Reliant relationship would eventually force a major dislocation in Biovail's sales efforts, a significant loss of experience, momentum, and good will, and an enormous increase in the costs associated with the Cardizem LA business as Biovail was required to replace Reliant's role internally at a significantly higher cost to the company. These efforts also materially contributed to a failure of Cardizem LA to reach the sales levels and profitability it would otherwise have reached.

143.    The same reputational damage caused the group of banks (the "Bank Syndicate") providing Biovail with its revolving credit facility to refuse to renew its credit facility in or about late 2003. The potential loss of Biovail's credit facility forced it to divert cash to debt reduction that would otherwise have been used to grow the business. Moreover, although Biovail would ultimately succeed in renewing that facility, it did so on far less favorable and far more costly terms, which substantially limited its ability to pursue the business and strategic objectives -- including product and strategic acquisitions -- it would otherwise have pursued and materially

61

hampered its ability to operate profitably. As a direct result of the harm the Enterprise's scheme inflicted on Biovail's Cardizem LA sales effort and ability to do business, Biovail ultimately abandoned its strategic initiative to directly sell Cardizem LA and its other drugs in the United States and instead returned to a far less profitable licensing business model.

144.   As a result of the Enterprise's attack on Biovail, Biovail was ultimately forced to lay off hundreds of employees and cut back on its operations. The Enterprise's misinformation campaign and other manipulative conduct also substantially contributed to many of the regulatory investigations and class action lawsuits initiated against Biovail and the substantial amounts of money and management attention and focus that were required to address those proceedings.

145.   The increased costs and expenses, lost profits, and diminished enterprise value that the Enterprise's scheme directly and proximately caused by the defendants' wrongful conduct is no less than $4.6 billion.

## CAUSES OF ACTION

### COUNT I

### RACKETEERING IN VIOLATION OF N.J.S.A. 2C: 41-2(c)
### (AGAINST ALL DEFENDANTS)

146.   Biovail restates each and every allegation of paragraphs 1 through 145 as if fully set forth herein.

147.   Defendants are persons as that term is used in N.J.S.A. 2C:41-1(b).

148.   Defendants comprise an association, associations and/or are associated-in-fact Enterprise as those terms are defined in N.J.S.A. 2C:41-1(c). The Enterprise has an existence

62

beyond that which is merely necessary to commit predicate acts and, among other things, oversaw and coordinated (and continues to oversee and coordinate) the commission of numerous predicate acts on an on-going basis in furtherance of the scheme and efforts to conceal the scheme. The Enterprise was operated, managed and controlled by each of the S.A.C. Defendants, the Camelback Defendants, the Gerson Lehrman Defendants, and Maris.

149. The conduct, acts, and omissions of the defendants set forth above were an integral part of the overall pattern and practices described herein, including using the facilities of United States interstate commerce to reap vast profits from their scheme to issue false and misleading statements to the public and, thereby, cause enormous harm to Biovail, its employees and investors.

150. The Enterprise and its scheme had and continue to have substantial ties to New Jersey, including the planning and execution of central elements of the scheme in New Jersey and the infliction of enormous monetary and other harm as a direct and proximate result of the scheme in New Jersey, including but not limited to the following:

- The Enterprise's attack on BPI was directly targeted at a corporation with its principal place of business in New Jersey. Indeed, as set forth more fully above, the interference with, and injury to, this New Jersey business were essential elements of the Enterprise's scheme.

- The scheme was in fact successful in significantly injuring this New Jersey business by interfering with its access to credit and financing, damaging its business reputation and critical business relationships, including with an important New Jersey business partner, and causing it to surrender lucrative business it would otherwise have enjoyed.

- This harm alleged to Biovail herein directly resulted in numerous New Jersey residents losing their jobs.

- The Enterprise's scheme also resulted in substantial losses on the part of New Jersey shareholders who had invested in the publicly-traded parent corporation of BPI, a New Jersey business.

63

- No fewer than six additional New Jersey companies were also targeted as part of the scheme with the same associated categories of injury.

- Critical elements of the scheme were executed in New Jersey, where several members of the Enterprise reside, do business, and conduct some or all of their Enterprise activities. For example, the materially false and misleading Maris reports concerning Biovail were on numerous occasions prepared, revised and, approved in New Jersey where Maris and various others working on those reports reside.

- Similarly, during the period covered by this complaint, the Camelback Defendants operated out of Summit, New Jersey offices and supported the scheme out of those New Jersey offices by, among other things, disseminating materially false and misleading reports, securing media coverage for those reports, and soliciting additional report requests, and the Camelback Defendants widely disseminated their fraudulent Biovail reports to New Jersey clients and Biovail investors.

- Enterprise members John Rocker and Rocker Partners have their principal place of business and conduct their Enterprise activities primarily in Essex County, New Jersey. From this Essex County base, the Rocker Enterprise members manage and operate their Enterprise activities, including their preparation and dissemination of the materially false and misleading Camelback reports, their communications with the Camelback Defendants and other Enterprise members, and their illegal trading.

- Enterprise member Gerson Lehrman has dozens, if not hundreds, of consultants on its payroll who reside and work in New Jersey, and numerous clients who use its services who live or operate in New Jersey, including Enterprise members Rocker Partners and Maris who use its service to further Enterprise activities. Gerson Lehrman managing director and Enterprise member Duff resides in New Jersey and conduct much of his Enterprise activities in New Jersey.

- Enterprise member S.A.C. participated in the Enterprise's scheme on behalf of various limited partners who reside or resided in New Jersey and who profited significantly from the Enterprise's scheme. Moreover, S.A.C. frequently had communications and coordinated with the Camelback Defendants through their New Jersey office and caused the Camelback Defendants to disseminate the S.A.C. ghost-written reports to numerous clients, investors, journalists, and media outlets through that New Jersey office, and otherwise to dozens of actually or potential investors located throughout New Jersey.

151.   Through the conduct and the acts and omissions set forth above, the defendants

knowingly and intentionally:

64

(a)     Used the mails in United States or foreign commerce to commit a fraud in violation of 18 U.S.C. § 1341;

(b)     Used the wires in United States or foreign commerce to commit a fraud in violation of 18 U.S.C. § 1343;

(c)     Committed and aided and abetted fraud in connection with the purchase and/or sale of securities in violation of N.J.S.A. 49:3-71, N.J.S.A. 2C:2-6, 15 U.S.C. §§ 78j and 78ff, and 17 C.F.R. § 240.10b-5;

(d)     committed and aided abetted the commission of deceptive business practices in violation of N.J.S.A. 2C:21-7 and 2C:2-6; and

(e)     committed and aided and abetted the commission of commercial bribery in violation of N.J.S.A. 2C:21-10 and 2C:2-6;

all of which are "predicate acts" under N.J.S.A. 2C:41-1(a).

152.    The defendants' conduct involved "at least two acts of racketeering activity . . . the last of which occurred within ten years after the commission of a prior act of racketeering activity" and therefore constituted a "pattern of racketeering" within the meaning of N.J.S.A. 2C:41-1(d)(1).

153.    As set forth above, this pattern consisted of repeated, continuous acts that had the same or similar purposes, results, participants, victims or methods of commission, and are interrelated by distinguishing characteristics rather than isolated events, within the meaning of N.J.S.A. 2C:41-1(d)(2).

154.    It was the purpose of the Enterprise to create and disseminate false and misleading reports concerning the businesses of Biovail and other companies, with the objective

65

of harming those companies and profiting from that harm through the short-selling of publicly-traded securities issued by those companies, including Biovail. This extensive market-manipulation scheme was intended to, and did, provide substantial profits to the members of the Enterprise. The Enterprise operated by the defendants achieved these objectives by the conduct of racketeering activity, including:

- engaging in blatant manipulation of the market for the publicly-traded securities of Biovail and other companies;

- commissioning false, misleading and ghost-written reports concerning Biovail and other companies;

- manipulating the issuance of such reports to benefit other Enterprise members and harm others to whom members of the Enterprise owed fiduciary and other duties;

- purchasing and/or selling securities in order to profit from the manipulated timing of the issuance of the fraudulent reports;

- charging Enterprise members and others substantial fees to receive the false and misleading information and reports that were created by Enterprise members;

- issuing analyst reports that falsely purported to be "independent" but were, in fact, premeditated attacks on a number of companies, including Biovail;

- fraudulently misrepresenting that Biovail shares were overvalued due to, among others things, corporate malfeasance, aggressive accounting, and criminal bribery by Biovail;

- planting false and misleading information concerning Biovail and other companies with securities analysts;

- rebroadcasting and disseminating that false and misleading information to the media and the public; and

- orchestrating false and misleading reports to the media by doctors paid by Enterprise members.

155.    Beginning at least as early as January 2003, and continuing until the date of this complaint, in furtherance of and for the purpose of executing and attempting to execute the described schemes and artifices to defraud, each of the defendants, on numerous occasions, used and caused to be used wire communications in interstate and foreign commerce and the U.S.

mails, by both making and causing to be made wire communications and mailings. These wire communications and mailings were made, *inter alia,* for the purposes of (i) communicating with one another to effectuate the dissemination of false and misleading information necessary to perpetrate the scheme to harm the business of Biovail and other companies and to artificially depress those companies' share prices; (ii) disseminating false and misleading analyst reports and other statements concerning the business and stock of Biovail and other companies; (iii) wiring monies periodically to compensate purportedly independent analysts and doctors; and (iv) coordinating their manipulation of the market for Biovail stock.

156.    Each such use of a wire communication and/or mailing in connection with the described schemes and artifices to defraud constitutes a separate and distinct violation of 18 U.S.C. §§ 1341 or 1343 and N.J.S.A. 2C:41-1(a)(2). The defendants used the wires and mails to perpetrate their fraudulent scheme and to disseminate the fraudulent reports attacking Biovail and other companies. While Biovail does not have full knowledge of the extent of the use of the wires and mails by the Enterprise in furtherance of the scheme, the following charts show some, but not all of those violations.

157.    The Camelback Defendants disseminated each of the approximately 84 "hatchet jobs" set forth in Table A, by electronic mail and U.S. mail to their clients. The Camelback Defendants distributed no fewer than 84 reports to clients, set forth in Table B. The distribution of these reports therefore constitutes approximately 6,888 separate fraudulent communications:

| TABLE A CAMELBACK REPORTS SENT TO CLIENTS | |
|---|---|
| Company Report/Bulletin | Date |
| 1.   Biovail Corp. Research Report | 6/20/2003 |
| 2.   Earnings Quality Analytics Alert: (Biovail Corp.) | 7/11/2003 |
| 3.   Overstock.com Research Report | 7/18/2003 |
| 4.   Biovail Corp. Research Report | 7/31/2003 |
| 5.   Earnings Quality Analytics: Watch List (AstraZeneca) | 8/8/2003 |
| 6.   King Pharmaceuticals, Inc. Research Report | 8/14/2003 |